Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: shanas@hbsslaw.com

Robert B. Carey (*Pro Hac Vice pending*)
Leonard W. Aragon (*Pro Hac Vice pending*)
Michella A. Kras (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
         leonarda@hbsslaw.com
         michellak@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RANDALL HEAGNEY, RICA GUERRERO, KERRIE GONNELLA, JOHN ROHLOFF, and JEWEL RULE, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN PAUL MITCHELL SYSTEMS,<br><br>Defendant. | CASE NO.  3:23-cv-00687-VC<br>Hon. Vince Chhabria<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed: February 15, 2023 |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     PARTIES ............................................................................................................. 2

III.    JURISDICTION AND VENUE .......................................................................... 3

IV.     DIVISIONAL ASSIGNMENT ........................................................................... 4

V.      FACTS ................................................................................................................ 4

        A.      History of JPMS ...................................................................................... 4

        B.      JPMS's "Cruelty Free" Promise ............................................................. 5

        C.      Animal Testing in the Cosmetic Industry ............................................. 13

        D.      Consumers' Attitudes Toward Animal Testing ..................................... 15

        E.      Regulations on Animal Testing for Cosmetics in the U.S. and
                Globally ................................................................................................. 15

        F.      Beauty Industry in China ...................................................................... 18

        G.      JPMS and the Chinese Market .............................................................. 24

        H.      Plaintiffs ................................................................................................ 34

VI.     CLASS ACTION ALLEGATIONS .................................................................. 42

VII.    COUNTS ........................................................................................................... 44

COUNT I BREACH OF EXPRESS WARRANTY ..................................................... 44

COUNT II VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL
        REMEDIES ACT (CLRA) CAL. CIV. CODE § 1750, *et seq.* ........................ 45

COUNT III VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
        CAL. BUS. & PROF. CODE § 17500, *et seq.* ............................................... 47

COUNT IV VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION
        LAW  CAL. BUS. & PROF. CODE § 17200, *et seq.* ..................................... 48

PRAYER FOR RELIEF ............................................................................................... 50

DEMAND FOR JURY TRIAL .................................................................................... 50

## I.      INTRODUCTION

1.      When a company makes promises or statements about its products, consumers should be able to trust those promises and statements.

2.      The law honors this truism and in fact goes even further. When a company makes factual statements and written promises on its products, the law deems those statements and promises to be part of the contract between the parties, and it protects consumers if the product fails to meet the promises or is not as stated on the label.

3.      Defendant John Paul Mitchell Systems ("JPMS") was founded on the principle that it would never test on animals, promising: "Never have. Never will." Since 1980, JPMS has publicized and reinforced this sentiment with its customers, always expressly emphasizing that its hair-care products were never tested on animals. JPMS went even further, actively publicly advocating against animal testing in the cosmetics industry and seeking, through legislation, to punish those who tested on animals.

4.      JPMS's promise that its products were never tested on animals can be found on every product it sells, as well as in all its other media, publicity, and public-relation materials, including advertisements, website, marketing campaigns, interviews, and press releases. Over the years, John Paul Mitchell Systems' product labels have promised in various ways and words that its products are 100% cruelty free. Those promises include: "Never Animal Tested"; "No Animal Testing"; "A Pioneer in Cruelty-Free Hair Care"; and "John Paul Mitchell Systems does not conduct or endorse animal testing."

5.      Yet, despite founding its company on the principle that it would never test on animals, repeating that promise for over 40 years, and seeking to change California law to punish those who test on animals, JPMS prioritized its profits over its principles. JPMS has not honored its promises, allowing animal testing on numerous products just to gain access to one of the world's biggest consumer marketplaces, China.

6.      JPMS claimed it never has and never will test on animals anywhere in the world, and in particular in China. While portraying itself in the United States as an animal rights pioneer,

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-00687-VC                     -1-

JPMS opted to sell its products in China where testing on animals was mandatory for companies like JPMS during the Class period. *See infra.*

7.  When a company agrees to perform animal testing to gain access to the Chinese market—while claiming the opposite in advertising, to the public, and on every product that it sells—consumers who purchased products with false representations about the characteristics of the products are harmed.

8.  Because the marketplace disdains cosmetic products affiliated with animal testing, the members of the Class were damaged at the point of sale by overpaying for cosmetics that were in fact actually tested on animals despite assurances on the product stating otherwise.

9.  Consequently, Plaintiffs bring this as a class action on behalf of purchasers of any JPMS hair-care products. Plaintiffs claim on behalf of the Class that this conduct breached the express warranties given to Plaintiffs and the Class; violated the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; and violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

## II.    PARTIES

10.  Plaintiff Randall Heagney is a resident of Berkeley, California, who purchased JPMS hair-care products.

11.  Plaintiff Rica Guerrero is resident of San Antonio, Texas, who purchased JPMS hair-care products.

12.  Plaintiff Kerrie Gonnella is a resident of Burke, Virginia, who purchased JPMS hair-care products.

13.  Plaintiff John Rohloff is a resident of Sulphur, Oklahoma, who purchased JPMS hair-care products.

14.  Plaintiff Jewel Rule is a resident of Tulsa, Oklahoma, who purchased JPMS hair-care products.

15.  JPMS was registered on March 31, 1980, as a California corporation. Its principal place of business is at 20705 Centre Pointe Parkway, Santa Clarita, CA, 91350.

### III.    JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because at least one class member is of diverse citizenship from Defendant, there are over 100 class members, and upon information and belief, the aggregate amount in controversy exceeds $5,000,000.

17.    This Court has personal jurisdiction over Plaintiff Heagney because he is a resident of this District.

18.    The Court has personal jurisdiction over the remaining Plaintiffs because they submit to this Court's jurisdiction.

19.    This Court has personal jurisdiction over JPMS because it is a California corporation, its principal place of business is in California, and it has conducted and continues to conduct business in California and in this District.

20.    Venue is proper in this District under 28 U.S.C. § 1391 because the events that gave rise to the claims occurred in substantial part in this District.

21.    Upon information and belief, JPMS developed, determined, and disseminated its cruelty-free claims at and from its headquarters in California.

22.    Upon information and belief, all marketing and advertising decisions related to JPMS's cruelty-free claims were made and disseminated from its headquarters in California.

23.    Upon information and belief, JPMS developed and determined the cruelty-free labels, promises, representations, and logos placed on all of its products from its headquarters in California.

24.    Upon information and belief, JPMS solicited salons and distributors across the country to sell and promote their cruelty-free hair-care products from its headquarters in California.

25.    Upon information and belief, JPMS decides which companies can sell its products and requires each third-party seller to be an authorized retailer from its headquarters in California.

26.    Upon information and belief, all decisions related to JPMS's cruelty-free claims were made at and disseminated from its headquarters in California, including its decision to sell

products in China, which required animal testing, while simultaneously telling its consumers it was not testing in China.

### IV.    DIVISIONAL ASSIGNMENT

27.    A substantial portion of the facts that gave rise to this Complaint occurred in Alameda County, California, and this case should be assigned to the San Francisco Division under Civil Local Rule 3-2(d).

### V.    FACTS

**A.    History of JPMS**

28.    JPMS is a manufacturer of professional hair-care products.

29.    In 1980, Paul Mitchell ("Mitchell") and John Paul DeJoria ("DeJoria") founded Paul Mitchell Systems, Inc. in California, which was later changed to John Paul Mitchell Systems.

30.    Mitchell was a well-known hair stylist, whose work was featured in major fashion magazines.

31.    DeJoria worked in the beauty products industry, holding several sales positions with Redken Haircare Products.

32.    Mitchell and DeJoria decided to combine their industry knowledge to form a company that would "provide luxury hair care at an affordable price."[1]

33.    JPMS was launched with just three products, all under the product line Paul Mitchell®: Shampoo One®, Shampoo Two®, and The Conditioner®.

34.    Mitchell acted as the face of JPMS, being featured in the advertising for the company.

35.    JPMS quickly expanded to include other products under the Paul Mitchell® brand.

36.    In 1989, Mitchell passed away and left his share of JPMS to his son, Angus Mitchell.

---

[1] Our Story, PAUL MITCHELL, https://www.paulmitchell.com/company (last visited Feb. 10, 2023).

1     37.     After Paul Mitchell's death, JPMS changed its marketing to make DeJoria the face

2 of JPMS. DeJoria is featured in JPMS's advertising campaigns and on the JPMS website.

3     38.     Around the same time, JPMS also recruited Luke Jacobellis to become an officer

4 and director of JPMS. Jacobellis served, and continues to serve, in various positions in the JPMS

5 organization.

6     39.     In 2001, JPMS established Paul Mitchell Schools as a joint venture with Von Curtis

7 Academy.

8     40.     These schools are operated under the brand-name of "Paul Mitchell Schools" and

9 have over 100 locations across the United States.

10     41.     Upon information and belief, California has more Paul Mitchell Schools than any

11 other state.

12     42.     Students that attend these schools exclusively use JPMS hair-care products and are

13 specifically educated about the JPMS brand, including its "cruelty free" promises.

14     43.     "Cruelty free" is a term used in the cosmetics industry that means products and the

15 ingredients in those products are not tested on animals anywhere in the development, testing,

16 manufacturing, or production of a product.

17     44.     In 2021, Michaeline DeJoria, John Paul DeJoria's daughter, took over as the CEO of

18 JPMS.

19     45.     Today JPMS manufactures hair-care products through several brands, including

20 Paul Mitchell®, Clean Beauty, Tea Tree, MITCH®, Awapuhi Wild Ginger®, Neuro®, and

21 MVRCK™.

22     46.     It is estimated that JPMS has annual revenues of over $1 billion per year.

23     47.     Upon information and belief—given JPMS's presence in California and the number

24 of individuals residing in California—JPMS sells more hair-care products in California than any

25 other state.

26 **B.     JPMS's "Cruelty Free" Promise**

27     48.     Since its formation, a key component of JPMS's brand was that JPMS's products

28 were cruelty free.

49.     Throughout its history, JPMS committed to never perform animal testing and included that commitment in its advertising, on its website, and on its products.

50.     JPMS claims it is a "A PIONEER IN CRUELTY-FREE HAIR-CARE SINCE 1980."[2]

51.     JPMS also promises: "No Animal Testing. Never Have. Never Will."



52.     People for the Ethical Treatment of Animal's ("PETA") has a certification program called "Beauty Without Bunnies," which requires companies to sign a statement of assurance verifying it does not test on animal anywhere in the world.

53.     In 1989, JPMS signed PETA's Beauty Without Bunnies statement of assurance "pledging never to test its products on animals," and JPMS appears on PETA's list of companies that does not test on animals anywhere in the world, including China.[3]

---

[2] Pioneer in Cruelty Free video, PAUL MITCHELL, https://www.paulmitchell.com/company/our-product (last visited Feb. 13, 2023).

[3] Featured Cruelty-Free Company: John Paul Mitchell Systems, PETA, https://www.peta.org/living/personal-care-fashion/paul-mitchell/ (last visited Feb. 10, 2022); John Paul Mitchell Systems, PETA, https://crueltyfree.peta.org/company/paul-mitchell-systems/ (last visited Feb. 10, 2023).

54.     In 2012, JPMS represented on its website: "Paul Mitchell is always looking out for our furry friends. In 1987, we became the first professional beauty company to announce that we don't conduct or endorse animal testing."[4]



**Protecting Our Animals**
Paul Mitchell is always looking out for our furry friends. In 1987, we became the first professional beauty company to announce that we don't conduct or endorse animal testing.

55.     For its 35th anniversary in 2015, JPMS reiterated its promises about animal testing: "For the 35 years we've been in business, we've never tested our products on animals (and never will!). In fact, we were the first professional beauty company to stand up against animal testing . . . ."[5]

56.     Upon information and belief, JPMS's claims about animal testing were developed and issued from its headquarters in California.

57.     In 2017, JPMS issued a blog statement about its new logo: "That's why we were the first professional beauty company to publicly stand up against animal testing—and 37 years later, we're still rockin' that pledge to our furry friends. Testing on animals is cruel and unnecessary, yet a lot of beauty brands still engage in this ugly practice. Not us! We never have, and we never will. Testing on actual humans makes way more sense, and that's why we're proud to have our very own Production Innovation Center to perfect our products for you . . . . We're so passionate about this cause that going forward in 2017, we're featuring a new 'No Animal Testing' logo on all of our products to emphasize and highlight our dedication."[6]

---

[4] Our Story, PAUL MITCHELL, https://web.archive.org/web/20120123203937/ http://www.paulmitchell.com/EN-US/OURSTORY/CARINGFOROURPLANET/ Pages/Home.aspx (last visited Feb. 10, 2023).

[5] *Cheers to 35 Years!*, PAUL MITCHELL, https://web.archive.org/web/20151223112327/https:// www.paulmitchell.com/our-story/our-blog/2015/april/cheers-to-35-years/ (last visited Feb. 10, 2023).

[6] *No Animal Testing*, PAUL MITCHELL, https://www.paulmitchell.com/blog/no-animal-testing# (last visited Feb. 10, 2023).



58.     In 2020, in honor of JPMS's 40th anniversary, JPMS unveiled a new logo on its products to highlight its "founding principle to never test on animals."[7]



2020

In honor of our 40th Anniversary, the Pioneer In Cruelty-Free Dove Logo is added to packaging to highlight our founding principle to never test on animals.

59.     Upon information and belief, the decisions to adopt new logos reiterating JPMS's cruelty-free stance, as well as the design, implementation, and placement on the products, were made from its headquarters in California.

60.     Today, JPMS continues to promote its cruelty-free stance.

61.     JPMS's website features "Our Story," which shows a photo of Mitchell and DeJoria next to its claim: "We were the first professional hair care company to take a stand against animal testing . . . ."[8]

**OUR STORY**

For more than forty years, we've served the professional beauty industry with salon-quality hair products and styling tools through our family of brands, including Paul Mitchell®, MITCH®, Awapuhi Wild Ginger®, Tea Tree, Paul Mitchell® Pro Tools™, Neuro™, Neon™, MarulaOil and MVRCK®. We were the first professional hair care company to take a stand against animal testing and continue our strong commitment to giving back, supporting a wide range of philanthropic causes, both domestically and internationally.

---

[7] Our Product, PAUL MITCHELL, https://www.paulmitchell.com/company/our-product (last visited Feb. 10, 2023).

[8] Our Story, PAUL MITCHELL, https://www.paulmitchell.com/company (last visited Feb. 10, 2023).

62.     The website also features photos of Michaeline DeJoria promoting JPMS as a "Pioneer in Cruelty-Free."[9]



63.     JPMS has an official Facebook page, where it claims: "CRUELTY-FREE SINCE 1980."[10]



64.     JPMS's official Instagram account promotes that it has been "CRUELTY-FREE SINCE 1980":[11]

---

[9] Our Product, PAUL MITCHELL, https://www.paulmitchell.com/company/our-product (last visited Feb. 10, 2023).

[10] Paul Mitchell (@PaulMitchellHairCareUS) FACEBOOK, https://www.facebook.com/PaulMitchellHairCareUS (last visited Feb. 10, 2023).

[11] Paul Mitchell (@paulmitchell), INSTAGRAM https://www.instagram.com/paulmitchell/ (last visited Feb. 10, 2023).

1
2
3
4
5



6    65.    In a recent Instagram post, JPMS reiterated that its products were "100% VEGAN"

7  and it was a "PIONEER IN CRUELTY-FREE HAIR CARE."[12]

8
9
10
11
12



13
14
15
16

17    66.    That Instagram post included the following caption:[13]

18
19
20    
21

22    67.    In promoting its clean beauty brand JPMS made the following post and caption,

23  claiming the products are both "cruelty-free" and "vegan":[14]

24

25    [12] Paul Mitchell (@paulmitchell), INSTAGRAM (June 5, 2022)  https://www.instagram.com

26  /p/Cebz5c5s5b5/ (last visited Feb. 10, 2023).

     [13] Id.

27    [14] Paul Mitchell (@paulmitchell), INSTAGRAM (April 16, 2022) https://www.instagram.com/

28  p/CcbA0Y-p3Tm/ (last visited Feb. 10, 2023).

1
2
3
4
5
6
7
8
9



10   68.     In promoting its Tea Tree brand, JPMS made the following post and caption, again

11   promising its products are vegan and cruelty free:[15]

12
13
14
15
16
17
18
19
20
21

22   69.     Most products on JPMS's website are advertised as being vegan, and show the

23   following symbol:[16]

24
25

26     [15] Paul Mitchell (@paulmitchell), INSTAGRAM (February 11, 2022) https://www.instagram.com/
p/CZ22Zd2pjQW/ (last visited Feb. 10, 2023).

27     [16] *E.g.*, Awapuhi Shampoo, PAUL MITCHELL https://www.paulmitchell.com/paul-mitchell/
28   original/awapuhi-shampoo (last visited Feb. 10, 2023).

70.     In promoting its clean beauty brand, JPMS claims its products are "VEGAN" and "A PIONEER IN CRUELTY-FREE HAIR CARE."[17]



71.     Upon information and belief, the representations and content of JPMS's website and social media pages were developed and issued from its headquarters in California

72.     JPMS includes their representations and promises about being cruelty-free on the products, and/or product labels.

73.     These images are just a few examples of JPMS's labels, promising they never perform animal testing or that their products are cruelty free:











---

[17] Clean Beauty, PAUL MITCHELL https://www.paulmitchell.com/paul-mitchell/clean-beauty/whats-new (last visited Feb. 10, 2023).

74.     Upon information and belief, the decision to put JPMS's cruelty-free claims on all its products and product labels was made from its headquarters in California.

**C.     Animal Testing in the Cosmetic Industry**

75.     Animal testing has been used in the cosmetics industry in the past to ensure that products were safe for consumers to use.

76.     Testing performed on animals in the cosmetics industry include various toxicity and irritancy tests.

77.     Acute toxicity tests are used to determine the danger of exposure to a chemical by mouth, skin, or inhalation and is usually performed on mice or rats.[18]

78.     LD50, also known as Lethal Dose 50, is a type of acute toxicity test where animals are dosed with a test chemical to determine the dose at which half of the test animals die.[19]

79.     Fixed dose method is another type of acute toxicity test, but it does not use death at the endpoint. The testing will be stopped when the animal demonstrates signs of ailment or distress.[20]

80.     Other acute toxicity tests include the up-and-down procedure and acute toxic class methods. While these tests do not result in the death of the animal, the animals will often endure intense pain, convulsions, loss of motor function, and seizures.[21]

81.     The animals are killed when all the testing is complete so a necropsy can be performed to determine internal damage.[22]

---

[18] Animals in Science, AMERICAN ANTI-VIVISECTION SOCIETY, https://aavs.org/animals-science/how-animals-are-used/testing/ (last visited Feb. 10, 2023); Earnest Oghenesuvwe Erhirhie, Chibueze Peter Ihekwereme, & Emmanuel Emeka Ilodigwe, *Advances in acute toxicity testing: strengths, weaknesses and regulatory acceptance*, Interdisciplinary Toxicology, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6117820/ (last visited Feb. 10, 2023).

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

82.     The Draize test is a test devised in 1944 by John H. Draize and Jacob M. Spines, toxicologists at the FDA, to assess how chemicals cause eye and skin irritation. The Draize test is generally performed on rabbits, particularly albino rabbits, although the testing can be performed on other animals as well.[23]

83.     During the testing a chemical is placed in the eye or on the skin of a conscious and restrained animal, left on for a set amount of time, rinsed off, and its effects then recorded.[24]

84.     The animals are then observed for up to fourteen days looking for signs of erythema and edema in the skin or redness, swelling, discharge, ulceration, hemorrhaging, cloudiness, or blindness in the tested eye.[25]

85.     The animals are killed after the testing if the test causes irreversible damage to the eye or skin. If the test does not cause permanent damage, the animas are typically used again once all traces of the tested product have dispersed from the testing site.[26]

86.     Skin sensitization tests are used to determine if a chemical causes an allergic reaction.

87.     One type of skin sensitization test is the Guinea Pig Maximization Test, where a chemical is injected into the guinea pig, along with a chemical adjuvant to boost the immune reaction. Multiple doses are given until the animal develops an allergic reaction.[27]

88.     Another skin sensitization test is the Buehler test, which is similar to the Guinea Pig Maximization Test, but no adjuvant is used to boost the immune reaction.[28]

---

[23] Draize test, WIKIPEDIA, https://en.wikipedia.org/wiki/Draize_test (last visited Feb. 10, 2023).

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Animals in Science, AMERICAN ANTI-VIVISECTION SOCIETY, https://aavs.org/animals-science/how-animals-are-used/testing/ (last visited Feb. 10, 2023).

[28] *Id.*

89.     In both the Buehler test and the Guinea Pig Maximization test the animals are killed after testing.[29]

90.     A more recent and commonly used skin sensitization test is the Local Lymph Node Assay (LLNA), where test chemicals are applied to the surface of the ears of mice. The mice are then killed and then their lymph node cells are removed and analyzed.[30]

91.     These tests are not performed on the individual products sold to consumers, but in the development or approval of such products, meaning animal testing would be done on a sample of a particular product or on its components.

**D.     Consumers' Attitudes Toward Animal Testing**

92.     Consumers around the world have called for the end of animal testing for cosmetics. A vast number of consumers are opposed to it.[31]

93.     U.S. consumers prefer cosmetic products that have not been tested on animals.

94.     In a recent poll from 2019, 79% of Americans support a federal law that would end animal testing on cosmetics.[32]

**E.     Regulations on Animal Testing for Cosmetics in the U.S. and Globally**

95.     The FDA has the authority to regulate cosmetics under the Federal Food, Drug, and Cosmetic Act ("FD&C Act"), related statutes, and regulations promulgated under the FD&C Act.[33]

---

[29] *Id.*

[30] *Id.*; Local lymph node assay, WIKIPEDIA, https://en.wikipedia.org/wiki/Local_lymph_node_assay (last visited Feb. 10, 2023).

[31] Kerry Postelwhite, *'Brands can no longer ignore the 8.3 million people who want end to animal testing'*, REUTERS EVENTS, https://www.reutersevents.com/sustainability/brands-can-no-longer-ignore-83-million-people-who-want-end-animal-testing, (last visited Feb. 10, 2023).

[32] New Poll Reveals US United Against Cosmetics Animal Tests, CRUELTY FREE INTERNATIONAL, https://crueltyfreeinternational.org/latest-news-and-updates/new-poll-reveals-us-united-against-cosmetics-animal-tests (last visited Feb. 10, 2023).

[33] Animal Testing & Cosmetics, U.S. Food & Drug Administration https://www.fda.gov/cosmetics/product-testing-cosmetics/animal-testing-cosmetics (last visited Feb. 10, 2023).

96.     "The FD&C Act does not specifically require the use of animals in testing cosmetics for safety, nor does the Act subject cosmetics to FDA premarket approval."[34]

97.     The FDA goes beyond not requiring animal testing to inform that animal testing is not required and to suggest that "consideration should be given to the use of scientifically valid alternative methods to whole-animal testing."[35]

98.     Because the practice of animal testing is found to be objectionable and cruel by so many, several states and other countries have gone further and banned the practice.

99.     In 1988, the United Kingdom was the first country to ban animal testing on cosmetics.

100.    The European Union also banned animal testing on cosmetics in a phased approach that was completed in 2013.

101.    Other countries including Israel, India, Turkey, Brazil, New Zealand, and Norway also have bans on animal testing.

102.    Ten states have passed laws that ban or limit the sale of cosmetic products tested on animals, including Virginia (Va. Code Ann. § 59.1-572), California (Cal. Civ. Code § 1834.9.2), Louisiana (La. Stat. Ann. § 51:772), New Jersey (N.J. Stat. Ann. § 4:22-59), Maine (Me. Rev. Stat. tit. 10, § 1500-M), Hawaii (Haw. Rev. Stat. Ann. § 321-30.4), Nevada (Nev. Rev. Stat. Ann. § 598.993), Illinois (410 Ill. Comp. Stat. Ann. 620/17.2), Maryland (Md. Code Ann., Health-Gen. § 21-259.20), and New York (N.Y. Gen. Bus. Law § 399-AAAAA).

103.    The legislative history of some of these laws reveals public support for banning animal testing.

104.    Nev. Rev. Stat. Ann. § 598.993 prohibits the sale of cosmetics that have been tested on animals after January 1, 2020.

105.    The legislative history of Nev. Rev. Stat. Ann. § 598.993 shows that the motivations for the bill were, in part, to meet the demand of and protect consumers: "Consumers

---

[34] *Id.*

[35] *Id.*

*overwhelmingly* are starting to reject products tested on animals. Statistically, businesses that have eliminated their animal testing policies have been successful and profitable. On an anecdotal level, I can tell you that I have had dozens of people come to me since I introduced this bill and say, I only use products that are not tested on animals; I always check the label; and it is so hard to know if a product has been tested on animals." Nevada Assembly Committee Minutes, 5/15/2019 (emphasis added).

106.    Cal. Civ. Code § 1834.9.5, prohibits manufacturers from selling cosmetics in California if the cosmetic was tested on animals after January 1, 2020.

107.    The legislative history of Cal. Civ. Code § 1834.9.2 (S.B. 1249) shows that over 4,000 individuals contacted the legislature to voice support of the bill. California Bill Analysis, S.B. 1249 Sen., 8/28/2018. In contrast only four entities (and no individuals) voiced opposition to the bill. *Id.*

108.    The bill analysis also provided: "The bill has received an ***intense groundswell of support from concerned citizens, animal welfare groups, and many companies in the cosmetic industry*** that are strongly committed to a vision of a truly "cruelty-free standard" for cosmetic products sold in California. The bill is also supported by a coalition of approximately 80 cosmetic companies who attest that they are proof that a company can be profitable but also committed to manufacturing products without any reliance on animal testing whatsoever." California Bill Analysis, S.B. 1249 Assem., 6/26/2018 (emphasis added).

109.    That analysis further noted: "The Committee has received over 6,500 letters in support of the bill from individuals providing a California address, and has taken note of an online petition signed by more than 150,000 persons from around the world, voicing support for this bill." California Bill Analysis, S.B. 1249 Assem., 6/26/2018.

110.    While that law was being debated in the California legislature, JPMS also showed support for the law but took it a step further and lobbied the California legislature to adopt a more restrictive law that would not have provided certain exemptions, including not exempting manufacturers from selling in California if they sold in any foreign markets where animal testing was required, such as China.

111.    DeJoria sent a letter on behalf of JPMS to the California Senate Judiciary Committee opposing the exemption: "Our company is committed to manufacturing products without harming any animals and we do not purchase ingredients from suppliers that test their products on animals. We have also been able to gain approval for a small, select group of products for sale in China without the use of animal testing." California Bill Analysis, S.B. 1249 Sen., 8/6/2018.

112.    Despite JPMS's representations that they could sell in China without testing on animals, the exemption for companies who sold in foreign markets that required animal testing was included in the final bill.

**F.    Beauty Industry in China**

113.    According to one industry report, as of 2020, the Chinese cosmetics market is the second largest in the world after the United States, which includes skincare, haircare, and other toiletries.[36]

114.    China has an increasing demand for "higher quality, premium brand products."[37]

115.    More than half of Chinese cosmetics consumers prefer foreign brands over local ones.[38]

116.    The market size of cosmetics in China was more than 455 billion yuan in 2021, equivalent to over $65 billion at the current exchange rate.[39]

117.    For 2023, the retail trade revenue of hair-care products in China amounts to $8.46 billion, making the Chinese hair-care market extremely lucrative for U.S. companies.[40]

---

[36] Cosmetics market size in China from 2013 to 2021 with forecasts until 2023, STATISTA, https://www.statista.com/statistics/875794/china-cosmetics-market-size/ (last visited Feb. 10, 2023).

[37] Id.

[38] Id.

[39] Id.; Chinese Yuan to United States Dollar, GOOGLE FINANCE, https://www.google.com/finance/quote/CNY-USD?sa=X&ved=2ahUKEwj8w72Vwov8AhUzMUQIHeJlBlgQmY0JegQIBhAc (last visited Feb. 10, 2023).

[40] Hair Care - China, STATISTA, https://www.statista.com/outlook/cmo/beauty-personal-care/personal-care/hair-care/china (last visited Feb. 13, 2023).

118.    According to the United States Department of Commerce, "[n]iche and premium hair products are the fastest growing segment for U.S. exports to China."[41]

119.    Until 2021 it was mandatory for foreign manufacturers and distributors who wanted to sell products in China to obtain a specific approval issued by the National Medical Products Administration ("NMPA") (formerly the China Food and Drug Administration ("CFDA")).

120.    Hair-care products, such as shampoo, conditioner, and styling products, are classified under Chinese law as ordinary or "non-special use cosmetics."

121.    Starting in 1990, the NMPA required all imported non-special use cosmetics to be tested on animals in Chinese designated and certified laboratories before they could be approved for importation and distribution in the Chinese market.

122.    From 1990 to November 7, 2018, all foreign-produced non-special use cosmetics needed to be registered with and approved by the NMPA before they could be imported and sold in China.

123.    To receive NMPA registration on foreign-produced non-special use cosmetics, a company must appoint and register a domestic responsible agent in China.

124.    The domestic responsible agent must file an application with the NMPA on behalf of the company that includes an examination and testing report issued by a NMPA-designated examination and testing institution.

125.    All NMPA-designated testing institutions are in China.

126.    This means the domestic responsible agent must hire a laboratory in China to perform the required testing. These laboratories are designated and certified by the Chinese government.

127.    The examination and testing report is governed by Chinese specific regulations, with standards issued in 2002, updated in 2007, and updated again in 2015.

---

[41] Asia Personal Care & Cosmetics Market Guide, 2016, United States Department of Commerce, International Trade Administration. Relevant excerpts of the guide are attached as Exhibit 1.

128.     From 2007 to 2014, China's Hygienic Standards for Cosmetics (2007) dictated the required examination and testing report. A translation of those standards is attached as Exhibit 2.

129.     Those standards provide that the examination and testing report include multiple skin irritation tests for cosmetics used daily, acute skin irritation tests for cosmetics rinsed after use, and acute eye irritation tests for products that may come into contact with eyes.

130.     The specifications for those tests are described in detail in the Hygienic Standards for Cosmetics.

131.     The acute skin irritation test includes applying the test substance to the shaved skin of the animal, leaving the product on for 2 hours or longer, and then observing skin reactions at 1, 24, 48, and 72 hours after the product is removed.

132.     The multiple skin irritation test includes the same procedure as the acute skin irritation test, but the product is applied to the animal every day for 14 days, shaving the animal's skin before each application.

133.     The 2007 Standards note regarding the skin irritation tests: "Animals should be humanely executed if they show signs of severe depression and distress at any stage of the test."

134.     The acute eye irritation test involves applying the test substance in the conjunctival sac of one eye of the animal and not rinsed for at least 24 hours, but the substance is only rinsed if deemed necessary. The eyes are examined at 1, 24, 48, and 72 hours after the substance is applied. If no irritation is found, the test is terminated. If irritation is found, the test continues and the eyes of the animals are examined again at 4 and 7 days.

135.     The 2007 Standards note regarding the acute eye irrigation test: "Animals that show signs of severe depression and distress at any stage of the test should be humanely put to death and the subject evaluated appropriately in the light of the test. Animals that show corneal perforation, corneal ulceration, corneal 4 points for more than 48h, lack of light reflex for more than 72h, conjunctival ulceration, gangrene and decay, which are usually signs of irreversible damage, should also be humanely executed."

136.     Since 2015, the examination and testing report is governed by the Safety and Technical Standards for Cosmetics (2015). A translation of those standards is attached as Exhibit 3.

137.    Those standards provide that the examination and testing report must include the acute dermal irritation test and the acute eye irritation test.

138.    The specifications for those tests are similar to the 2007 tests and are described in detail in the Safety and Technical Standards for Cosmetics, but they include placing the product to be tested in the eye of the animal or on the shaved skin of the animal, leaving that product in the eye or on the skin, and observing its effects at 1, 24, 48, and 72 hours after application.

139.    Those regulations also provide: "If animals show severe depression and pain at any stage of the trial, they should be executed humanely."

140.    The process to import products into China is also described by the United States Department of Commerce in its "Asia Personal Care & Cosmetics Market Guide, 2016" (attached as Exhibit 1), which states:

> Cosmetics in China are categorized as ordinary and special use cosmetics. Perfume, skin care, shampoo and color cosmetics fall into ordinary products and special use products refer to hair dye, hair perm, hair-growing, sunblock, anti-spot, slimming, breast-beautifying, depilatories and deodorant etc.
>
> According to the CFDA (China Food and Drug Administration), all foreign cosmetic product manufacturers must complete a safety and health quality test, and obtain a hygiene permit before they are allowed to sell in the Chinese market. Application for this pre-market approval process can only be carried out by a Chinese legal entity. Overseas cosmetics manufacturers without legal representation in China are thus required to apply for the permit through agent services. The Manufacture [sic] needs to sign a "Letter of Authorization" confirming that it authorizes a Chinese company to be the registration responsible party in mainland China for the products.
>
> **Safety and Health Quality Test**
> This test is performed by designated laboratories appointed by the CFDA and are listed on the CFDA website. All these labs have different testing capabilities designated for testing against specific conditions, such as microbiology, hygienic chemistry, toxicology test (which includes animal testing) or conducting safe-for-human-use trials (for special use cosmetics). The test normally takes 2-3 months for ordinary cosmetics and 3-8 months for special-use cosmetics, while costs vary from $700 to $6,000 depending on the types and complexity of the products.

141. The Department of Commerce also describes the required testing and the application procedures:

**Safety and Health Quality Test**
This test is performed by designated laboratories appointed by the CFDA and are listed on the CFDA website. All these labs have different testing capabilities designated for testing against specific conditions, such as microbiology, hygienic chemistry, toxicology test (which includes animal testing) or conducting safe-for–human-use trials (for special use cosmetics). The test normally takes 2-3 months for ordinary cosmetics and 3-8 months for special-use cosmetics, while costs vary from $700 to $6,000 depending on the types and complexity of the products.
. . .
**Hygiene Permit for Imported Cosmetics**
Once testing is completed, the designated laboratory will issue a test report which needs to be submitted together with the other required documents for the application of the Hygiene Permit from CFDA. A committee under CFDA convenes to technical review and evaluate of [sic] imported cosmetics. The technical review time will be 3 months generally. If one application has been approved, a certificate will be issued by the CFDA. Companies need to submit the following documents (all translated in Chinese and notarized by a Chinese notarization company):

Application form for the cosmetic product to be imported
  • Chinese product name and nomenclature;
  • Product formula;
  • Product quality and safety control file (The product info such as appearance, flavor, batch no and shelf life is required. Other quality control index like heavy metals and microbiology should be provided as well);
  • Original product packaging including labelling information and product information sheet;
  • Testing report and relevant data from testing organization certified by CFDA;
  • Safety assessment report of cosmetics containing potential risk substances;
  • Stamped copies of power of attorney and business license of Chinese responsible agent;
  • Statement from manufacturer guaranteeing that materials used meet the requirements of BSE free regions.
  • Free Sale Certificate at production country (region) or country (region) of origin
  • Brief description and diagram of production process
  • Technical requirements for cosmetic products in text

• Other relevant information which can support the application

The applicant will be notified by the CFDA within 5 days confirming whether the application is accepted or not. If the application is not accepted, the CFDA will provide explanation of discrepancies or missing documentation allowing the application to be resubmitted.

The Hygiene Certificate is valid for 4 years, and foreign manufacturers are required to renew it at least 4 months before it is expired.

142.     Foreign-produced cosmetics also must be imported through China in accordance with its customs regulations.

143.     Through 2021, a company would have had to provide a copy of the NMPA registration when going through customs, along with other information required under Chinese law.[42]

144.     An imported non-special use cosmetic must include a product label, which must list the manufacturer, the domestic responsible agent, and the NMPA registration number.

145.     After November 7, 2018, non-special use cosmetics only require a premarket registration and can be imported after registration has been completed. That premarket registration requires the same animal testing as the earlier registrations—as detailed in the Safety and Technical Standards for Cosmetics (2015)—but changes the timing for when a product can be imported into China.

---

[42] These requirements are found in the Measures for the Supervision and Administration of Inspection and Quarantine of Imported and Exported Cosmetics (formerly General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China) (Order No. 143, revised according to Orders No. 238, No. 240, and No. 243 of the General Administration of Customs), the Announcement from General Administration of Customs (Announcement No. 99 of 2020), and Announcement on Adjusting the Supervision Requirements for Some Imported and Exported Goods (Announcement No. 99 of 2020).

146.     Up until 2018, a registration with the NMPA lasted four years, meaning that every foreign-produced cosmetic sold in China would have to be registered every four years and undergo animal testing every four years.

147.     After 2018, registrations do not expire, but starting on January 1, 2022, the registrant must provide an annual report to the NMPA. If an annual report is not filed, the NMPA may cancel the registration.

148.     In addition to the premarket animal testing, all foreign-produced non-special use cosmetics can be subjected to post-market safety testing by Chinese authorities. This post-market testing includes animal testing.

149.     On February 26, 2021, the NMPA promulgated the Administrative Provision for Cosmetics Registration and Filing Documents ("2021 Provision"), which allows foreign manufacturers of non-special use cosmetics to receive an exemption from animal testing. Starting on May 1, 2021, as a guarantee of safety, the NMPA can accept a specified certification and product safety assessment from the country of manufacture, instead of requiring animal testing.

150.     Since the 2021 Provision came into effect, several foreign manufacturers, including at least one based in California, have been granted approvals without requiring animal testing.

151.     Since 2014, a cosmetic company can also get an exemption from animal testing by setting up or using domestic manufacturing facilities in China.

152.     Domestic manufacturers of non-special use cosmetics can receive an exemption from animal testing, although they can still be subject to post-market testing by Chinese authorities. This post-market testing includes animal testing.

**G.     JPMS and the Chinese Market**

153.     Upon information and belief, JPMS began selling hair-care products in China in 2001.

154.     Upon information and belief, JPMS registered 62 products in China from 2001 to 2010. A list of those registrations is attached as Exhibit 4.

155.     As each registration is good for four years, JPMS had products registered to be sold in China from 2001 through 2012.

156.     Each of those product registrations would have required a testing report, meaning that JPMS selected and retained a Chinese laboratory to perform animal testing.

157.     In 2012, PETA exposed multiple cosmetic companies, both in the United States and Europe, that claimed to be cruelty free but had been selling products in China and undergoing animal testing.

158.     PETA threatened to remove those companies from its Beauties Without Bunnies certification program if they did not stop selling in China.

159.     That same year, JPMS announced that it would pull out of the Chinese market because it had been informed of the animal testing requirements to sell in China.[43]

160.     DeJoria is quoted as saying: "Since Paul Mitchell was founded in 1980, we have been cruelty-free. We do not conduct or condone animal testing on our products, and we will not attempt to market our products in China until alternatives to animal testing methods have been accepted by the government. We are honored and encouraged to be working with China to bring about positive change. Paul Mitchell always has been and always will be cruelty-free!"[44]

161.     In a January 18, 2013 press conference posted on YouTube, DeJoria stated the following: "We found out in 2010—right before 2011—that they changed the regulations in China where products, all products coming in were to be tested on animals. We immediately made an inquiry and saying: 'but we don't test on animals we test on ourselves before we come out with products can you make an exception?' And they said: 'Well, the regulations we have we think is for the public's interest.' We immediately made a decision to stop selling China. Why would you do such a thing? Our answer was simple. Because we believe what we say, and no amount of

---

[43] Paul Mitchell Receives PETA Plaudits for Pulling Out of Chinese Market, PETAUK, https://www.peta.org.uk/media/news-releases/paul-mitchell-receives-peta-plaudits-for-pulling-out-of-chinese-market/ (last visited Feb. 10, 2023).

[44] Id.

money can change our minds. Did we lose a lot of money by doing that? We sure did. But it was okay because we stood by what we believed in."[45]

162.     Upon information and belief, JPMS's decision to tell the public that it had been informed of changes in Chinese law and that it had left China was made and disseminated from its headquarters in California.

163.     There was no change in Chinese law in 2010 that required animal testing—animal testing had been required to sell imported cosmetics in China since at least 1990.

164.     Upon information and belief, instead of leaving China in 2012-2013, JPMS moved its operations to Hong Kong where animal testing is not required.

165.     On February 29, 2012, JPMS China Holding Company was set up in Hong Kong, with JPMS owning 70% of its shares.

166.     JPMS China Holding Company's directors included Luke Jacobellis, Fan Xu, and George Moon Lee.

167.     Upon information and belief, JPMS China Holding Company was set up to maintain JPMS's presence in China.

168.     In 2014, JPMS China Holding Company was dissolved.

169.     On February 28, 2014, JPMS China Investment LLC was incorporated in Nevada ("JPMS China").

170.     JPMS China also registered as an out of state limited-liability company in California with its principal place of business at 20705 Centre Point Parkway, Santa Clarita, CA 91350, the same address as JPMS's principal place of business.

171.     One of the current managers of JPMS China Nevada is Luke Jacobellis, a former director and current board member of JPMS.

172.     The other two managers of JPMS China Nevada are currently Fan Xu and Jason Yates (who was preceded by George Moon Lee). Yates is JPMS's current president.

---

[45] Paul Mitchell and Cruelty Free International London Press Conference at 1:16, YOUTUBE, https://www.youtube.com/watch?v=kzBOk_evx28 (last visited Feb. 10, 2023).

173.     JPMS China Nevada's corporate documents list Jacobellis, Xu, and Yates as all having addresses in California, with Jacobellis and Yates' address listed as 20705 Centre Point Parkway, Santa Clarita, CA 91350.

174.     On July 9, 2014, JPMS China Nevada established JPMS Cosmetics (Beijing) Co., Ltd. ("JPMS Beijing") in China.

175.     JPMS Beijing is a wholly owned subsidiary of JPMS China Nevada.

176.     Jacobellis and Fan Xu are also directors of JPMS Beijing.

177.     JPMS Beijing is JPMS's domestic responsible agent in China.

178.     From May 2015 to May 2021, JPMS Beijing, as JPMS's domestic responsible agent, registered 63 JPMS products for sale in China.

179.     As it takes six months to register a product with the NMPA, JPMS Beijing would have had to apply for registrations in 2014.

180.     A full list of those registrations is attached as Exhibit 5.

181.     The NMPA maintains a database, listing each of the registrations.

182.     Those products include Paul Mitchell®, Tea Tree, and MITCH® branded products.

183.     Each product received an NMPA registration number, meaning JPMS's domestic responsible agents submitted an application for each product that included the examination and testing report as outlined in the Safety and Technical Standards for Cosmetics.

184.     Each examination and testing report required JPMS's products (all 63 of them) to be tested on animals by the respective Chinese lab selected during the registration process.

185.     Each product also lists JPMS as the manufacturer of the product.

186.     JPMS also had to provide a copy of the NMPA registration when going through customs, along with other information required under Chinese law. *See supra*.

187.     JPMS could not have imported foreign non-special use cosmetics into China, or gone through Chinese customs, without an NMPA registration, each of which would require retaining a certified lab to do animal testing for that product.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

188.    The NMPA's approvals of JPMS's registrations reference JPMS's compliance with both the Hygienic Standards for Cosmetics (2007) and Safety and Technical Standards for Cosmetics (2015). A sample of those approvals are attached as Exhibits 6 and 7.

189.    JPMS products sold in China have the required product label and accompanying NMPA registration number. The following are images of some of those labels and registration numbers from JPMS products purchased in China:

   

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28











190.     Despite JPMS's statement that it had left China, it only paused operations in China in 2012 and 2013 and began seeking new NMPA registrations through JPMS Beijing in 2014.

191.     To avoid animal testing, JPMS could have availed itself of the 2014 regulations that allowed companies to manufacture products in China, rather than import them.

192.     Instead, JPMS continued to register and sell imported products in China from 2015 to 2021, an approach that required animal testing for each product.

193.     Upon information and belief, JPMS's decisions to create JPMS Nevada China, create JPMS Beijing, and begin registering new JPMS products in China—requiring that animal testing be performed by Chinese laboratories—were made and executed from its headquarters in California.

194.     On September 7. 2017, JPMS announced that it was "NOW OFFICIALLY OPEN FOR BUSINESS IN CHINA!"[46]



Mara Gourdine / September 7, 2017 / News

GREAT NEWS: *NOW OFFICIALLY OPEN FOR BUSINESS IN* CHINA!



John Paul Mitchell Systems® is pleased to announce it has successfully gained acceptance to market select Paul Mitchell® and Tea Tree products in China—without animal testing.

After forming a dedicated team, creating relationships with experts and educators, and partnering with a U.S.-based testing facility, JPMS is able to service hairstylists and guests in China while maintaining its core corporate value of zero animal testing. Thanks to years of research and diligence, co-owner John Paul DeJoria's steadfast commitment to providing the finest-quality, cruelty-free professional products continues today.

---

[46] Mara Gourdine, *Great News: Now Officially Open for Business in China!*, PEACE LOVE AND HAPPENINGS, https://www.peaceloveandhappenings.com/great-news-now-officially-open-for-business-in-china/ (last visited Feb. 10, 2023).

195.    JPMS claimed that it could sell select Paul Mitchell and Tea Tree products in China without animal testing, despite there being no exceptions in Chinese law to avoid animal testing for imported cosmetics and no record of an exemption from the NMPA.

196.    Even though Chinese regulations require the testing to occur in approved labs, which are all in China, JPMS claims that it performed some testing in front of China regulators in a U.S. based testing facility and, as a result of that testing demonstration, was exempted from the animal testing requirements in China that apply to all imported non-special use cosmetics.

197.    JPMS has continued to represent to this day that it is exempt.

198.    In 2020, JPMS issued a response to how it was able to get approval in China without animal testing: "John Paul Mitchell Systems® brought a group of respected scientists from China to work side by side and train with their team and, as a result, the China FDA accepted the impressive results and reproducibility of the non-animal test alternatives and agreed to test a small selection of products for approval without the normal animal testing required. Subsequently, we were granted approval to market a select offering of Paul Mitchell® and Tea Tree products in China—without animal testing."[47]

199.    In lobbying the California legislature in 2020 to remove an exemption from SB 1249—allowing manufacturers to sell in California even if they sold in any foreign markets where animal testing was required—DeJoria represented that JPMS had an exemption to animal testing in China and the foreign market exemption should be removed from the bill.

200.    Despite these representations, the NMPA—the only Chinese authority that can grant an exemption—has confirmed that before the change in law in 2021, no company was given an exemption to animal testing, and it has specifically confirmed that JPMS has not been granted any exemptions from animal testing.

201.    In response to Plaintiffs' pre-filing CLRA demand letter, JPMS reiterated to Plaintiffs that it obtained an exemption from animal testing in China—an exemption that the

---

[47] Is Paul Mitchell Cruelty-Free and Vegan?, ETHICAL ELEPHANT, https://ethicalelephant.com/paul-mitchell-cruelty-free-vegan/#:~:text=Is%20Paul%20Mitchell%20Cruelty%2DFree%3F,animals%2C%20anywhere%20in%20the%20world (last visited Feb. 10, 2023).

1   NMPA would have had to grant, that no other foreign manufacturer has, and that is not recorded in

2   Chinese law or regulations.

3           202.    JPMS initially reiterated that it had invited Chinese officials to the U.S. to see their

4   alternative testing methods and JPMS was granted an exemption on 14 products because of that

5   visit, despite having registered over 100 products in China.

6           203.    JPMS later claimed that it had entered into a memorandum of understanding (the

7   "MOU") and a cooperation agreement (the "Cooperation Agreement") with the Beijing Institute for

8   Drug Control ("BIDC") to obtain an exemption.

9           204.    BIDC is a qualified inspection institute supervised by Beijing Municipal Medical

10  Products Administration (Beijing MPA). BIDC is mainly responsible for the inspection and testing

11  of cosmetics, drugs, vaccines, health food and the formulation of relevant technical standards.

12          205.    As an inspection institute supervised by Beijing MPA, BIDC has a high reputation

13  for drug and cosmetics safety and faithfully fulfilling its obligation to public health.

14          206.    According to BIDC's website, BIDC has a laboratory for toxicology tests, meaning

15  the BIDC conducts toxicology tests on animals.

16          207.    JPMS provided a copy of the MOU to Plaintiffs, which simply states that the parties

17  will work together to find "alternative animal testing methods for China hair beauty market."

18          208.    JPMS also provided an unsigned copy of the Cooperation Agreement to Plaintiffs,

19  which states that the BIDC will implement "the research on alternative methods," use JPMS

20  products "as a pilot for data collection of alternative method," "implementing the alternative

21  cosmetics toxicological experimental study," promote "alternative toxicological test methods to be

22  the national standard for cosmetics," do "the toxicological test to JPMS's products," and submit

23  "data collected from toxicological test based on JPMS's products to SFDA and get[] import

24  licenses."

25          209.    JPMS states that it will provide information "about the alternative toxicological test

26  methods," it will contact "related labs to train the researchers of BIDC," and it will help "BIDC

27  contact with related experts and organizing technique seminar of the alternative toxicological

28  tests."

210. Neither the MOU nor the Cooperation Agreement show that JPMS eventually obtained an exemption from the NMPA. At best they show that JPMS was exploring alternative testing methods while obtaining registrations through the normal channels.

211. After receiving these documents, Plaintiffs reached out to the BIDC and it confirmed that it is only an "inspection institute," that it "has no right to give exemptions for the toxicological tests," and if a company has an exemption, that exemption would have to presented to the reviewing department (NMPA)."

212. After the BIDC confirmed that only the NMPA could grant an exemption, Plaintiffs again reached out to the NMPA. The NMPA once again confirmed there were no exemptions before the change in law in 2021 and that no exemption had been granted to JPMS.

213. JPMS claims it had an exemption from animal testing in 2017, but it has no documentation or record of that exemption.

214. JPMS was also selling and registering products in China for more than a decade before it announced it had an exemption in 2017, a period predating the self-proclaimed exemption, and which required animal testing.

215. Upon information and belief, JPMS's decision to claim it had a valid exemption from the animal testing requirements in China—and to continue to tout such contrived exemption for years—was made and issued from its headquarters in California.

216. In June 2022, China canceled all of JPMS's active product registrations.

217. Upon information and belief, those registrations were canceled because JPMS failed to file annual reports with the NMPA.

218. Upon information and belief, JPMS is still selling JPMS products previously imported into China even though those products are not properly registered with the NMPA.

219. Although foreign companies have been able to set up domestic manufacturing to avoid animal testing since 2014, JPMS waited until 2021 to engage domestic manufacturers.

220. In 2021, JPMS engaged two domestic manufacturers—Guangzhou Baiyun District Longgui Xuangu Fine Chemical Plant and Guangzhou Lingyu Cosmetics Co., Ltd.—to

manufacture four of JPMS's products in China. These products are sold under the trademark "FZTL."

221.    In August 2022, the registrations for the JPMS products manufactured by Guangzhou Baiyun District Longgui Xuangu Fine Chemical Plant were canceled.

222.    Upon information and belief, JPMS has continued to sell all four products under the trademark FZTL in China.

**H.    Plaintiffs**

223.    Plaintiff Randall Heagney has purchased JPMS products since the late 1980s/early 1990s.

224.    Heagney was introduced to JPMS products by his hair stylist in Stockton, California.

225.    Before making his first purchase of JPMS products he knew that JPMS claimed to be a cruelty-free brand, and it was a "selling point at the time of purchase."

226.    Heagney also saw the "no animal testing" labels on the bottles of the JPMS products and relied on those labels in purchasing JPMS products.

227.    Heagney would not have purchased JPMS products had he known any of JPMS's products were tested on animals.

228.    Heagney used the Paul Mitchell Awapuhi Shampoo and Paul Mitchell Awapuhi Conditioner. He purchased and used the Awapuhi Conditioner until about 2014–2015, and he purchased and used the Awapuhi Shampoo through 2020.

229.    JPMS obtained NMPA approval for the Paul Mitchell Awapuhi Shampoo and Awapuhi Conditioner in China, meaning those products were tested on animals in a Chinese lab.

230.    Heagney generally purchased his JPMS products either directly at a salon or from CVS and paid the listed retail price.

231.    Heagney was not aware that JPMS was testing on animals to sell in China until he contacted undersigned counsel, which occurred on approximately September 27, 2022.

232.     Heagney would not have continued to purchase JPMS products through 2020 had he known JPMS tested on animals, regardless of where that testing occurred.

233.     Heagney liked JPMS's products and would have continued using them, but he no longer trusts the labeling on the products.

234.     Plaintiff Rica Guerrero has purchased JPMS products since approximately 2008.

235.     Guerrero was first introduced to JPMS products by her hairdresser at Nikko's Salon in Fresno, California.

236.     The Tea Tree products were promoted to her as vegan and all-natural.

237.     After she was recommended JPMS products, she looked at the labels and investigated to determine if they were vegan and cruelty free. She noticed the labels on the bottles saying the products were vegan and she noticed the bunny logo, which she knows means the product is cruelty free.

238.     Guerrero did additional research on the product, including visiting the JPMS website, to verify that the products were vegan and cruelty free.

239.     Guerrero actively looks for vegan products because she has sensitive skin.

240.     Guerrero does not agree with animal testing and looks for brands and products that are cruelty free.

241.     Guerrero relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

242.     Guerrero was not aware that JPMS was testing on animals to sell in China until she contacted undersigned counsel, which occurred on approximately June 3, 2022

243.     Guerrero would not have purchased or continued to purchase JPMS products had she known any JPMS products had been tested on animals, regardless of where that animal testing occurred.

244.     Guerrero liked the products and would have continued to purchase them, but she no longer trusts the brand.

1

245.    Before finding out about the animal testing, Guerrero purchased approximately four

2

JPMS products per year. She generally purchases her products at the salon or on the ULTA

3

website.

4

246.    The last products Guerrero purchased were the Paul Mitchell Clean Beauty Anti-

5

Frizz Shampoo, Paul Mitchell SUPER SKINNY Serum, and the Tea Tree Shampoo.

6

247.    Guerrero purchased the Paul Mitchell Clean Beauty Anti-Frizz Shampoo and Paul

7

Mitchell SUPER SKINNY Serum in January or February 2022 from ULTA for the listed price on

8

ULTA's website on the date of purchase. These images are photos of those products:

9
10
11
12
13
14
15
16
17
18
19
20

 

21

248.    In making those purchases, Guerrero relied on JPMS's representations that its

22

products were vegan and cruelty free, including the representations on the bottles she purchased.

23

249.    JPMS obtained NMPA approval for Paul Mitchell SUPER SKINNY Serum and Tea

24

Tree Shampoo, meaning that product was tested on animals in a Chinese lab.

25

250.    Had Guerrero known that JPMS products were tested on animals, she would not

26

have purchased the Paul Mitchell Clean Beauty Anti-Frizz Shampoo, Paul Mitchell SUPER

27

SKINNY Serum, or Tea Tree Shampoo.

28

251.    Plaintiff Kerrie Gonnella began purchasing JPMS's Tea Tree products in 2016.

252.    Typically, Gonnella's practice is to research a company before purchasing from them because she is against animal testing.

253.    Gonnella researched JPMS shortly after she purchased her first two products to make sure they were cruelty free.

254.    Gonnella did a Google search about JPMS, reviewed JPMS's product labels, and searched PETA's website for JPMS to determine if they were cruelty free.

255.    Gonnella is opposed to animal testing for cosmetics and actively looks for products and brands that are cruelty free.

256.    Gonnella relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

257.    Gonnella was not aware that JPMS was testing on animals to sell in China until she contacted undersigned counsel, which occurred on approximately June 3, 2022.

258.    Gonnella would not have purchased or continued to purchase JPMS products had she known any JPMS  products had been tested on animals, regardless of where that animal testing occurred.

259.    Gonnella wanted to keep purchasing JPMS products, but she no longer trusts the labeling.

260.    Gonnella purchased approximately six total JPMS products. She generally purchases her products from Safeway.

261.    The last products Gonnella purchased were the Tea Tree Special Shampoo, Tea Tree Lemon Sage Thickening Conditioner, and Tea Tree Lemon Sage Thickening Shampoo.

1       262.    Gonnella purchased those products from Safeway in Burke, Virginia, in 2018 for the

2   listed retail price at the store. These images are photos of those products:

 



19       263.    In making that purchase, Gonnella relied on JPMS's representation that it was

20   cruelty free, including the representations on the bottles she purchased.

21       264.    JPMS obtained NMPA approval for the Tea Tree Special Shampoo, Tea Tree

22   Lemon Sage Thickening Conditioner, and Tea Tree Lemon Sage Thickening Shampoo, meaning

23   those products were tested on animals in a Chinese lab.

24       265.    Had Gonnella known that JPMS products were tested on animals, she would not

25   have purchased the Tea Tree Special Shampoo, Tea Tree Lemon Sage Thickening Conditioner, and

26   Tea Tree Lemon Sage Thickening Shampoo.

27       266.    Plaintiff John Rohloff began purchasing JPMS products in approximately 2004.

28

267.    Rohloff began using the products because they were recommended by a hairdresser.

268.    Rohloff saw the cruelty-free label on the JPMS bottling.

269.    Rohloff did some research on JPMS and was a fan of the products and brand because of their promises about sustainability and care for animals.

270.    Rohloff relied on JPMS's representations that the products he was purchasing were not tested on animals and that JPMS did not perform animal testing.

271.    Rohloff was not aware that JPMS was testing on animals to sell in China until he contacted undersigned counsel, which occurred on approximately June 2, 2022.

272.    Rohloff would not have purchased or continued to purchase JPMS products had he known any JPMS products had been tested on animals, regardless of where that animal testing occurred.

273.    Rohloff really enjoyed using JPMS products and would have continued to purchase them, but he no longer trusts their labeling.

274.    Before he found out about JPMS's animal testing, Rohloff purchased approximately four JPMS products per year. He generally purchases his products through Amazon.com.

275.    The last products Rohloff purchased were the Paul Mitchell Awapuhi Moisture Mist, Paul Mitchell Soft Style Soft Sculpting Spray Gel, and Paul Mitchell The Conditioner.

276.    Rohloff purchased three bottles of the Paul Mitchell Awapuhi Moisture Mist on November 17, 2021, for $19.50 each. He purchased one bottle of the Paul Mitchell Soft Style Soft



Sculpting Spray Gel on May 2, 2021, for $17.00. Rohloff also purchased two bottles of the Paul Mitchell The Conditioner in 2021 for approximately $30.00 each. These images are photos of those products:

277.    In making those purchases, Rohloff relied on JPMS's representation that its products were cruelty free, including the representations on the bottles he purchased.

278.    JPMS obtained NMPA approval for Paul Mitchell The Conditioner, meaning that product was tested on animals in a Chinese lab.

279.    Had Rohloff known that any of JPMS's products were tested on animals, he would not have purchased the Paul Mitchell Awapuhi Moisture Mist, Paul Mitchell Soft Style Soft Sculpting Spray Gel, and Paul Mitchell The Conditioner.

280.    Plaintiff Jewel Rule has used JPMS products for at least 15 years.

281.     Rule was recommended the products by a hairdresser at a salon.

282.    After she purchased the products, she did independent research to check out JPMS and recalls discovering that they were cruelty free.

283.    Rule saw the representations on the product labels stating that they were cruelty free, including the bunny logo which she equates with cruelty free.

284.    Rule is opposed to animal testing for cosmetics and actively looks for products that are cruelty free.

285.    Rule relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

286.    Rule was not aware that JPMS was testing on animals to sell in China until she contacted undersigned counsel, which occurred on approximately June 6, 2022.

287.    Rule would not have purchased or continued to purchase JPMS products had she known any JPMS products had been tested on animals, regardless of where that animal testing occurred.

288.    Rule wanted to continue purchasing JPMS products but no longer trusts the labeling.

289.    Before she found out about JPMS's animal tested, Rule purchased approximately five to ten JPMS products per year. She generally purchases her products at a salon or at ULTA.

290.    The last products Rule purchased were the Tea Tree Special Color Conditioner, Tea Tree Special Shampoo, Paul Mitchell Flexible Style Round Tip, Paul Mitchell Ultimate Wave, Awapuhi Wild Ginger Styling Treatment Oil, and Awapuhi Wild Ginger Hydrocream Whip.

291.    Rule purchased Paul Mitchell Flexible Style Round Trip and Paul Mitchell Ultimate Wave on May 28, 2022, for $46.33 and August 9, 2021, for $41.87 from Great Clips. She also purchased other JPMS products from Great Clips on December 12, 2021, for $24.00; June 13, 2021, for $18.00; May 3, 2021, for $18.00; and March 22, 2021, for $18.00. She purchased JPMS products from Tulsa Hair Company on August 25, 2022, for $17.00 and September 21, 2021, for $17.00. Rule also purchased JPMS products from Amazon.com for the price listed on the website on February 15, 2020; December 11, 2018; and March 3, 2018. These images are photos of the products she still has:



292.    In making these purchases, Rule relied on JPMS's representation that its products were cruelty free, including the representations on the bottles she purchased.

293.    JPMS obtained NMPA approval for the Tea Tree Special Color Conditioner and Tea Tree Special Shampoo, meaning those products were tested on animals in a Chinese lab.

294.    Had Rule known that any of JPMS's products were tested on animals, she would not have purchased any JPMS products.

1

## VI.    CLASS ACTION ALLEGATIONS

2    295.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3)

3    individually and for this Class of similarly situated individuals:

4        All individuals who, between May 1, 2015, and June 30, 2022,
         purchased, directly from JPMS or through an authorized third-party
5        retailer or salon, a John Paul Mitchell Systems Inc. hair-care product
         branded as Paul Mitchell®, Clean Beauty, Tea Tree, MITCH®,
6        Awapuhi Wild Ginger®, Neuro®, or MVRCK™.

7    296.    Excluded from the Class are JPMS and its co-conspirators, their officers, directors,

8    legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated

9    companies; Class counsel and their employees; and the judicial officers and their immediate family

10    members and associated court staff assigned to this case, and all persons within the third degree of

11    relationship to any such persons. The Class is clear and ascertainable using the objective criterion

12    of purchases, which can be proven using Defendant's business records. For further clarity, as used

13    above, styling tools are not "hair-care products," and thus any such purchase does not alone render

14    a purchaser a member of the Class.

15    297.    **Numerosity**. The Class is so numerous that joinder of all members is unfeasible and

16    impracticable. JPMS sells millions of products each year in hundreds of locations. The exact size

17    of the Class is easily ascertainable, as each transaction or purchase can be tracked using

18    Defendant's business records. Any reasonable estimate, based on sales, indicates there are millions

19    of Class members.

20    298.    **Commonality and Predominance**. Questions of law and fact common to all Class

21    members exist and predominate over questions affecting only individual Class members, including:

22        a.    Whether Defendant stated or promised on all its hair-care products that its
              hair-care products were cruelty free or never tested on animals;
23
24        b.    Whether Defendant advertised its hair-care products by stating that it never
              tested on animals and that it was cruelty free;
25
26        c.    Whether Defendant performed animal testing, or had animal testing performed
              on its behalf, on hair-care products to sell them in China;
27
          d.    Whether Defendant misrepresented that it had an exemption from animal
              testing to sell hair-care products in China;
28

e.   Whether Defendant delivered hair-care products to the Class that met its "cruelty free" promise;

f.   Whether Defendant delivered hair-care products to the Class that met its promise to never test on animals;

g.   Whether Defendant breached their express warranties with the Class members;

h.   Whether Defendant violated the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*;

i.   Whether Defendant violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*;

j.   Whether Defendant violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; and

k.   Whether the Class was damaged by paying more for hair-care products than they would have if the truth had been disclosed, and, if so, by what amount.

299.   **Typicality**. Plaintiffs' claims are typical of the claims of the other members in the Class, as they arise out of the uniform and pervasive conduct of Defendant, involve the same legal theories, and challenge the same practices of Defendant. Plaintiffs and all Class members have been subjected to the same falsehoods and practices, hold the same rights, are entitled to the same legal and equitable relief, have suffered the same impact and injury, and sustained similar damage by paying an amount for hair-care products that they would not have paid or greater than that which they would have paid had JPMS not affirmatively misrepresented that its hair-care products were cruelty free and never tested on animals.

300.   **Adequacy**. Plaintiffs and their counsel will fairly and adequately represent the interests of the Class members. Plaintiffs have no interests antagonistic to, or in conflict with, the interests of the other Class members, and they will zealously pursue their claims. Plaintiffs' lawyers are highly experienced in the prosecution of consumer class actions and complex commercial litigation, capable of providing the financial resources needed to litigate this matter to conclusion, and have litigated other consumer rights matters in a class context.

301.   **Superiority**. A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiffs and the Class members. Plaintiffs and the Class members—many of whom are unaware of their rights—have been harmed by Defendant's

1   misrepresentations. Litigating this case as a class action reduces the possibility of repetitious

2   litigation relating to Defendant's wrongful actions and provides an efficient mechanism for

3   adjudication for Class members, whose claims are too small to warrant individual litigation.

4       302.   **Injunctive and Declaratory Relief**. JPMS has acted or refused to act on grounds

5   that apply generally to the Class and final injunctive relief, or corresponding declaratory relief is

6   appropriate respecting the Class as a whole.

7   ## VII.   COUNTS

8   ### COUNT I

9   ### BREACH OF EXPRESS WARRANTY

10      303.   Plaintiffs reallege and incorporate by reference the allegations in the preceding

11  paragraphs.

12      304.   JPMS sells hair-care products, which qualify as goods under the Uniform

13  Commercial Code. Cal. Com. Code §§ 2105, 2800.

14      305.   Plaintiffs purchased various JPMS hair-care products between May 1, 2015, and

15  June 30, 2022.

16      306.   In connection with the sale of goods, including through representations on the

17  products themselves, JPMS expressly warranted that its hair-care products were not tested on

18  animals.

19      307.   Plaintiffs notified JPMS of the nonconformities in the hair-care products on

20  November 15, 2022, which was a reasonable time after Plaintiffs discovered the breach.

21      308.   All the wrongful conduct alleged occurred, and continues to occur, in the conduct of

22  Defendant's business and was devised and executed at its headquarters in California. Defendant's

23  wrongful conduct is part of a pattern or generalized course of conduct that is ongoing, both in

24  California and nationwide.

25      309.   Because of JPMS's breach of its express warranty, Plaintiffs have suffered damages

26  valued at the difference between the value of a hair-care product they received and the value of the

27  hair-care product they were promised, in an amount to be proven. Cal. Com. Code § 2714.

28

**COUNT II**

**VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (CLRA)**

**CAL. CIV. CODE § 1750, *et seq.***

310.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

311.    JPMS is a "person" under Cal. Civ. Code § 1761(c).

312.    Plaintiffs are "consumers" under Cal. Civ. Code § 1761(d), who purchased JPMS hair-care products.

313.    JPMS hair-care products are "goods" used for "personal, family, or household purposes" under Cal. Civ. Code § 1761(a).

314.    Plaintiffs' purchases of JPMS products are "transactions" under Cal. Civ. Code § 1761(e)

315.    The CLRA prohibits the following "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer:"

      a.    "Misrepresenting the source, sponsorship, approval, or certification of goods or service" (Cal. Civ. Code § 1770(a)(1));

      b.    "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (Cal. Civ. Code § 1770(a)(7)); and

      c.    "Advertising goods or services with intent not to sell them as advertised." Cal. Civ. Code § 1770(a)(9).

316.    JPMS engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1770(a), as described herein, by representing and certifying that its hair-care products are cruelty free and never tested on animals, by representing that its hair-care products are cruelty free when they are tested on animals, by claiming to have an exemption from animal testing in China that it does not have, and by advertising its hair-care products as cruelty free with the intent to sell hair-care products that had been tested on animals.

317.    JPMS's actions occurred in the sale of goods to a consumer.

318.     JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, as set forth, were material and likely to deceive a reasonable consumer.

319.     In purchasing JPMS products, Plaintiffs and the Class relied on the misrepresentations of JPMS regarding its stance on animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

320.     Had Plaintiffs and the other Class members known they would not receive products that had never been animal tested, they would not have purchased JPMS's hair-care products and/or paid as much for them.

321.     Plaintiffs suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing in Plaintiffs' products.

322.     All the wrongful conduct alleged occurred, and continues to occur, in the conduct of Defendant's business and was devised and executed at its headquarters in California. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is ongoing, both in California and nationwide.

323.     Under Cal. Civ. Code § 1780(a)(1), Plaintiffs, individually and on behalf of the other Class members, seek actual damages against JPMS for the harm caused by JPMS's violations of the CLRA as alleged.

324.     Plaintiffs seek an order enjoining Defendant's unfair or deceptive acts or practices and restitution under Cal. Civ. Code § 1780(a)(2), (3).

325.     Plaintiffs, individually and on behalf of the other Class members, seek punitive damages against Defendant under Cal. Civ. Code § 1780(a)(4) because they willfully and consciously disregarded the rights of Plaintiffs and the Class. Defendant intentionally and willfully misrepresented material facts that only it knew, specifically that it performed no animal testing and its products were cruelty free. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

326.    Plaintiffs, individually and on behalf of the other Class members, seek costs of court, attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

327.    Plaintiffs, for themselves and as representatives of the Class, sent a notice and demand over thirty days before suing, as specified by Cal. Civ. Code § 1782(a), and JPMS has not offered a correction, repair, replacement, or remedy.

### COUNT III

### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW

### CAL. BUS. & PROF. CODE § 17500, *et seq.*

328.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

329.    Cal. Bus. & Prof. Code § 17500 makes it unlawful for a company to induce the public to enter into an obligation related to personal property with a statement made in advertising, marketing, or publication, including any statement made on the internet, it knows is untrue or misleading, or with the exercise of reasonable care should know is untrue or misleading.

330.    JPMS caused to be made or disseminated through California and the United States, through advertising, marketing, social media, product labels, and other publications, statements that were untrue or misleading, and which were known, or which, if exercising reasonable care, would have been known to JPMS, to be untrue and misleading to consumers, including to Plaintiffs and the other Class members.

331.    JPMS violated Cal. Bus. & Prof. Code § 17500 because the misrepresentations that JPMS's hair products had never been tested on animals and were cruelty free, as set forth, were material and likely to deceive a reasonable consumer.

332.    JPMS made the misrepresentations with the intent to sell hair-care products.

333.    Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, because of Defendant's unfair, unlawful, and/or deceptive practices.

334.    In purchasing JPMS products, Plaintiffs and the other Class members relied on JPMS's misrepresentations that it was opposed to animal testing, that its products were cruelty free,

and that its products were never tested on animals. JPMS's representations turned out not to be true

because it tested on animals to sell its products in China. Had Plaintiffs and the other Class

members known this, they would not have purchased the hair-care products and/or paid as much

for them. Plaintiffs and the other Class members overpaid for their hair-care products and did not

receive the benefit of their bargain.

335.    All the wrongful conduct alleged occurred, and continues to occur, in the conduct of

Defendant's business and was devised and executed at its headquarters in California. Defendant's

wrongful conduct is part of a pattern or generalized course of conduct that is ongoing, both in

California and nationwide.

336.    Plaintiffs, individually and on behalf of the other Class members, request that this

Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing

their unfair, unlawful, or deceptive practices and to restore to Plaintiffs and the other Class

members any money Defendant acquired by false advertising, via restitution or disgorgement, and

for any other just and proper relief.

**COUNT IV**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**CAL. BUS. & PROF. CODE § 17200, *et seq.***

337.    Plaintiffs reallege and incorporate by reference the allegations in the preceding

paragraphs.

338.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et*

*seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business

act or practice and unfair, deceptive, untrue or misleading advertising."

339.    **Unlawful Act.** Defendant's conduct constitutes an unlawful business practice in

violation of the UCL, because Defendant has violated California's Legal Remedies Act, Cal. Civ.

Code § 1750, *et seq.*, and California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et*

*seq.*

340.    **Unfair Act.** Defendant's conduct constitutes an unfair business practice in violation

of the UCL in, at a minimum, these ways:

a.   By marketing its products as being cruelty free when JPMS tests on animals;

b.   By labeling its products as cruelty free and never tested on animals when it does test on animals;

c.   By promising consumers that its products have never been tested on animals;

d.   By representing on their products that they are cruelty free and never tested on animals; and

e.   By claiming to have an exemption to sell in China that does not require animal testing when no such exemption exists.

341.   **Unfair, Deceptive, Untrue or Misleading Advertising.** Defendant's conduct constitutes an unfair, deceptive, untrue, or misleading advertising in violation of the UCL in, at a minimum, these ways:

a.   Advertising on its website and social media accounts that its products are cruelty free and never tested on animals; and

b.   Placing labels on its products representing that its products are cruelty free and never tested on animals.

342.   Defendant falsely advertised with the intent to sell their hair-care products.

343.   Defendant knew, or should have known, that these representations were false.

344.   JPMS's misrepresentations caused Plaintiffs and the other Class members to purchase or pay more for JPMS hair-care products. Absent those misrepresentations, Plaintiffs and the other Class members would not have purchased the JPMS products.

345.   All the wrongful conduct alleged occurred, and continues to occur, in the conduct of Defendant's business and was devised and executed at its headquarters in California. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is ongoing, both in California and nationwide.

346.   Plaintiffs and the other Class members have suffered injury in fact, including lost money and undesirable merchandise, as a result of Defendant's misrepresentations.

347.   Plaintiffs seek to enjoin under Cal. Bus. & Prof. Code § 17203 further unlawful, unfair, or/or fraudulent practices, and further unfair, deceptive, untrue, or misleading advertisements.

348.   Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or fraudulent practices and their unfair, deceptive, untrue, or misleading advertisements, as provided by Cal. Bus. & Prof. Code § 17535; to restore to Plaintiffs and members of the Class via restitution or disgorgement, any monies Defendant acquired by unfair competition, as provided by Cal. Bus. & Prof. Code § 17203; and for such other relief as may be just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and for members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.   Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel and Plaintiffs as class representatives;

B.   An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint, including its representations that it has never tested on animals, its products are cruelty free, it performs no animal testing, and it has sold in China under an exemption;

C.   An order temporarily and permanently enjoining Defendant from continuing its unfair, deceptive, untrue, or misleading advertising alleged in this Complaint, including its representations that it has never tested on animals, its products are cruelty free, it performs no animal testing, and it has sold in China under an exemption;

D.   Costs, restitution, damages, and/or disgorgement, each in an amount to be determined;

E.   Punitive damages;

F.   Pre- and post-judgment interest on any amounts awarded;

G.   An award of costs and attorneys' fees where authorized by law; and

H.   Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED: May 18, 2023

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Shana E. Scarlett*

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: shanas@hbsslaw.com

Robert B. Carey (*Pro Hac Vice pending*)
Leonard W. Aragon (*Pro Hac Vice pending*)
Michella A. Kras (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
           leonarda@hbsslaw.com
           michellak@hbsslaw.com

*Attorneys for Plaintiffs*