Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: shanas@hbsslaw.com

Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
Michella A. Kras (*Pro Hac Vice*)
E. Tory Beardsley (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        leonarda@hbsslaw.com
        michellak@hbsslaw.com
        toryb@hbsslaw.com

*Attorneys for Plaintiffs and
the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| RANDALL HEAGNEY, RICA GUERRERO, KERRIE GONNELLA, JOHN ROHLOFF, and JEWEL RULE, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN PAUL MITCHELL SYSTEMS,<br><br>Defendant. | CASE NO. 3:23-cv-00687-VC<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**[REDACTED]**<br><br>Hrg. Date:  May 15, 2025<br>Hrg. Time:  10:00 a.m. PST<br>Location:    Courtroom 4 – 17th Floor<br>Judge:        Hon. Vince Chhabria |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 15, 2025, at 10:00 a.m. PST, or as soon thereafter as the matter may be heard before the Honorable Vince Chhabria of the United States District Court for the Northern District of California, San Francisco Division, located at Courtroom 4 – 17th Floor 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs will and hereby do move for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

This motion is based on this Notice of Motion and Motion for Class Certification, the accompanying memorandum of points of authorities, and all accompanying declarations and exhibits, the pleadings and papers on file in this action, oral argument and such other matters as the Court may consider in hearing this motion.

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................1

II.    FACTUAL BACKGROUND.................................................................2

III.   ARGUMENT ............................................................................9

    A.    The Class is identifiable..................................................10

    B.    The case meets the requirements of Rule 23(a). ....................................11

        1.    The Class is sufficiently numerous. ...........................................11

        2.    There are questions of law and fact common to the Class, satisfying Rule 23(a)(2). ....................................................................12

        3.    Rule 23(a)(3) is met because Plaintiffs' claims are typical of the Class's claims. .................................................................15

        4.    Adequacy is satisfied under Rule 23(a)(4)..................................16

    C.    The Class meets the requirements of Rule 23(b)(3). ...............................16

        1.    The Class meets the predominance test. ......................................17

            a.    Breach of Express Warranty ..........................................17

            b.    California Consumer Legal Remedies Act ("CLRA") .................18

            c.    California False Advertising Law ("FAL") ...................................20

            d.    California Unfair Competition Law ("UCL")...............................21

    D.    Damages..............................................................22

        1.    A class action is the superior method of adjudicating this case................24

    E.    Manageability of the Class Action Trial ................................................25

IV.   CONCLUSION............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Licorice Co. v. Total Sweeteners, Inc.*,
No. C-13-1929 EMC, 2013 WL 4396778 (N.D. Cal. Aug. 13, 2013)....................................13

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997)..........................................................................................................17

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)..........................................................................................................10

*Blennis v. Hewlett–Packard Co.*,
No. C 07–00333, 2008 WL 818526 (N.D. Cal. Mar.25, 2008) ...............................17

*Cover v. Windsor Surry Co.*,
No. 14-CV-05262-WHO, 2016 WL 520991 (N.D. Cal. Feb. 10, 2016) ...............................14

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .........................................................................................10, 16

*Farar v. Bayer AG*,
No. 14-CV-04601-WHO, 2017 WL 5952876 (N.D. Cal. Nov. 15, 2017) .............................10

*Frlekin v. Apple Inc.*,
309 F.R.D. 518 (N.D. Cal. 2015).........................................................................................15

*Gold v. Lumber Liquidators, Inc.*,
323 F.R.D. 280 (N.D. Cal. 2017).........................................................................................24

*Ham v. Hain Celestial Grp., Inc.*,
70 F. Supp. 3d 1188 (N.D. Cal. 2014) ...............................................................................21

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ...........................................................................................12

*Hawkins v. Kroger Co.*,
337 F.R.D. 518 (S.D. Cal. 2020)  .......................................................................................12

*Hernandez v. Balakian*,
251 F.R.D. 488 (E.D. Cal. 2008) .........................................................................................14

*Ivie v. Kraft Foods Glob., Inc.*,
961 F. Supp. 2d 1033 (N.D. Cal. 2013) ...............................................................................21

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ...........................................................................................22

*Karim v. Hewlett-Packard Co.*,
  No. C 12-5240 PJH, 2014 WL 555934 (N.D. Cal. Feb. 10, 2014) .........................................18

*Krommenhock v. Post Foods, LLC*,
  334 F.R.D. 552 (N.D. Cal. 2020) ..........................................................................................20

*Kumar v. Salov N. Am. Corp.*,
  No. 14-CV-2411-YGR, 2016 WL 3844334 (N.D. Cal. July 15, 2016) ..................................19

*Lytle v. Nutramax Lab'ys, Inc.*,
  114 F.4th 1011 (9th Cir. 2024), cert. denied, 2025 WL 663695 (U.S. Mar. 3,
  2025) ................................................................................................................................ *passim*

*Mass. Mut. Life Ins. Co. v. Super. Ct.*,
  119 Cal. Rptr. 2d 190 (Ct. App. 2002), *as modified on denial of reh'g* (May
  29, 2002) ................................................................................................................................22

*Meyer v. Portfolio Recovery Assocs., LLC*,
  707 F.3d 1036 (9th Cir. 2012) ...............................................................................................15

*Milan v. Clif Bar & Co.*,
  340 F.R.D. 591 (N.D. Cal. 2021) .....................................................................................18, 23

*Parkinson v. Hyundai Motor Am.*,
  258 F.R.D. 580 (C.D. Cal. 2008) ......................................................................................14, 15

*Pirozzi v. Apple, Inc.*,
  966 F. Supp. 2d 909 (N.D. Cal. 2013) ...................................................................................21

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) .................................................................................................21

*Rojas-Lozano v. Google, Inc.*,
  159 F. Supp. 3d 1101 (N.D. Cal. 2016) .................................................................................18

*In re Rubber Chemicals Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) .....................................................................................12, 24

*Rushing v. Williams-Sonoma, Inc.*,
  No. 16-CV-01421-WHO, 2024 WL 779601 (N.D. Cal. Feb. 21, 2024) ...............................23

*Scholl v. Mnuchin*,
  489 F. Supp. 3d 1008 (N.D. Cal. 2020) .................................................................................11

*Tietsworth v. Sears*,
  720 F. Supp. 2d 1123 (N.D. Cal. 2010) .................................................................................22

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ...........................................................................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)................................................................................12

*Wallenstein v. Mondelez Int'l, Inc.*,
  No. 22-CV-06033-VC, 2024 WL 4293904 (N.D. Cal. Sept. 25, 2024) ................................23

*West v. California Servs. Bureau, Inc.*,
  323 F.R.D. 295 (N.D. Cal. 2017).....................................................................11

*Wolin v. Jaguar Land Rover N. Am.*,
  LLC, 617 F.3d 1168 (9th Cir. 2010)........................................................12, 15, 24

*Wolph v. Acer Am. Corp.*,
  272 F.R.D. 477 (N.D. Cal. 2011).....................................................................10

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) .....................................................................9, 10

**Statutes**

Cal. Bus. & Prof. Code § 17200 ........................................................................21

Cal. Civ. Code § 1770(a)(1).............................................................................18

Cal. Com. Code § 1103..................................................................................13

California Consumer Legal Remedies Act ......................................................... *passim*

California False Advertising Law...............................................................14, 20, 21, 25

California Unfair Competition Law..............................................................14, 21, 22, 25

Uniform Commercial Code.......................................................................13, 14, 25

**Other Authorities**

Federal Rule of Civil Procedure 23 .............................................................. *passim*

## I.      PRELIMINARY STATEMENT

This case arises from the deceptive conduct of Defendant John Paul Mitchell Systems ("JPMS"), which instituted a corporate scheme to conceal its animal testing in China, while touting its cruelty-free promise to sell hair-care products in the United States. JPMS's wrongful acts were perpetrated against all its customers, making this case ideal for class action treatment. Plaintiffs Randall Heagney, Rica Guerrero, Kerrie Gonnella, John Rohloff, and Jewel Rule ("Plaintiffs") respectfully move under Federal Rule of Civil Procedure 23 for the Court to: (1) certify the Class; (2) appoint Randall Heagney, Rica Guerrero, Kerrie Gonnella, John Rohloff, and Jewel Rule as Class representatives for the Class; and (3) appoint Robert Carey of Hagens Berman Sobol Shapiro, LLP as Class counsel.

Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3). Rule 23(a)'s numerosity, commonality, typicality, and adequacy are all met. There are likely millions of Class members making joinder impracticable. Common questions of law and fact arise from JPMS's uniform misrepresentations about being a cruelty-free company and never testing on animals, when JPMS was in fact routinely testing on animals to sell products in China. Plaintiffs' claims are typical of the claims of all Class members, because each purchased JPMS products that falsely represented JPMS never tested on animals, and as a result, either purchased products they would not have had they known the truth or paid more for the product than it was worth. The interests of Plaintiffs and the Class do not conflict, Plaintiffs have fulfilled their roles as Class representatives and are represented by well-qualified counsel who are diligently prosecuting the Class claims.

Rule 23(b)(3) certification is warranted because common issues of law or fact predominate. Plaintiffs will prove their case with common evidence that every Class member could prove his or her individual claims with, including (1) JPMS represented and warranted that it was a cruelty-free company and its products were cruelty free, using phrases such as "a pioneer in cruelty free," "no animal testing," and "Paul Mitchell does not conduct or endorse animal testing;" and (2) JPMS arranged for its products to be tested on animals to sell products in China. As to the superiority prong of Rule 23(b)(3), each Class member has a claim too small (or too

concealed) to pursue individually. Even if this was untrue, resolution of the common issues would be superior to millions of individual suits.

## II.    FACTUAL BACKGROUND

Since its formation in 1980, JPMS has represented that as a company it never tests on animals and it is cruelty-free, specifically representing "No Animal Testing. Never Have. Never Will." Dkt. 28 ¶ 51, Dkt. 56 ¶ 51; Declaration of Michella Kras ("Kras Decl."), Exs. 1–6. JPMS also represents on every bottle it sells that it is cruelty free or never tests on animals. Kras Decl., Ex. 8, at 53:22–54:2. Those statements include "A Pioneer in Cruelty-Free Hair Care," "No Animal Testing," and "John Paul Mitchell Systems does not conduct or endorse animal testing." Dkt. 28 ¶ 73; Dkt. 56 ¶ 73. JPMS also advertises that it never tests on animals and is cruelty free. Kras Decl., Exs. 1–2, 4–6, 9. JPMS's representations about never animal testing and it being a cruelty-free company appear on its website and on its social media. Dkt. 28 ¶¶ 54–70; Kras Decl., Ex. 10. On both its Facebook and Instagram pages it states "CRUELTY-FREE SINCE 1980." Dkt. 28 ¶¶ 63–64; Dkt. 56 ¶¶ 63–64. To the selling public, the term cruelty free is used synonymously with no animal testing. Rebuttal Report of Dominique Hanssens, Ph.D. at ¶¶ 55–58 (███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████).[1] Kras Decl., Ex. 7. Luke Jacobellis, JPMS's President for twenty years (from approximately 2002–2022), confirmed that the terms are synonymous. Kras Decl., Ex. 8, at 14:15–21. He testified that "cruelty-free" means that JPMS does not test on animals. *Id.* 46:3–18. Jacobellis testified that when JPMS says "it's a pioneer in cruelty-free," it means JPMS is "the first professional hair care company that followed the process of no testing on animals on all their products." *Id.* 46:19–47:3. Jacobellis testified that "never have, never will" means that

---

[1] PETA's website has a "cruelty-free database," which states: "Welcome to the searchable database of companies that do and don't test their products on animals." Kras Decl. ¶ 93. Cruelty Free International, states on its website "Cruelty Free International works to create a world where no animals suffer in a laboratory." *Id.* ¶ 94. Leaping Bunny's database titled "Shop Cruelty-Free" requires certified companies to never test on animals. *Id.* ¶ 95.

JPMS as a company "never have or never will test on animals." *Id.* 56:1–14. Jacobellis testified

that "no animal testing" "means we do not perform animal testing on our products." *Id.* 56:15–

18. Jacobellis also testified that JPMS customers "should be able to rely on the promises made

by JPMS about its hair care products," including that the products were "cruelty-free" and "never

tested on animals." *Id.* 18:6–21:4. Relying on JPMS's representations that it is a cruelty-free

company and it never tests any of its products on animals, each of the Plaintiffs purchased JPMS

products. Kras Decl., Ex. 11, at 20:4–11, 28:11–29:5, 95:20–23, 103:10–19, 105:8–12, 20:12–19,

21:14–22:4; Kras Decl., Ex. 12, at 16:17–17:15, 18:12–16, 19:6–14, 21:25–22:10, 27:9–13; Kras

Decl., Ex. 13, at 26:13–17, 29:11–30:11, 72:22–74:13, 75:12–24; Kras Decl., Ex. 14, at 22:16–

25, 31:4–22, 33:19–34:8, 40:22–41:2; Kras Decl., Ex. 15, at 26:16–27:5, 27:23–28:19, 29:6–11,

34:18–35:1, 36:11–19.

Concealed from Plaintiffs and Class members was the fact that JPMS was breaking its

cruelty-free promises to consumers. From 2001 to 2021, JPMS imported dozens of its hair-care

products into China, each of which had to be registered with the National Medical Products

Administration ("NMPA") (formerly the China Food and Drug Administration ("CFDA"), also

referred to as the SFDA). Dkts. 28 ¶ 119, 28-2, 28-3. Chinese regulations dictated that to register

an imported hair-care product for sale in China, the registrant must appoint a domestic

responsible agent in China, and the product must first undergo animal testing by a certified lab in

China. Dkt. 28-2 at 7–8, 134–35; Dkt. 28-3 at 2-11;[2] Kras Decl., Exs. 16–17, 19–22. Specifically

Chinese regulations required that JPMS perform both a skin irritation test and an eye irritation

test on live animals, generally rabbits. Dkt. 28-2 at 7–8, 144–55; Dkt. 28-3 at 21-36; Kras Decl.,

Exs. 20–21. Despite claiming that one of JPMS's core founding principles is to never test on

animals, Jacobellis testified that JPMS does not "independently verify whether a specific country

requires animal testing." Kras Decl., Ex. 8, at 54:24–55:2, 68:6–8.

From 2001 to 2010, JPMS registered 62 products with the Chinese FDA. Dkt. 28-4; Kras

Decl., Ex. 23, at Resp. No. 1; Kras Decl., Ex. 24, at Resp. No. 4. JPMS hired several entities in

---

[2] Plaintiffs' page references are to the pages on the Court's docket.

China to act as its domestic responsible agent and obtain those registrations, specifically Shanghai Kenyou Trading Co., Ltd. ("Kenyou"), Kenxin Trading (Shanghai) Co. Ltd. ("Kenxin"), and Cantrust Trading (Shanghai) Ltd. ("Cantrust"). Kras Decl., Ex. 23, at 4–6; Kras Decl., Ex. 16; Kras Decl., Ex. 22. JPMS was listed as the registrant and owner of those registrations. Kras Decl., Exs. 25–30. Jacobellis testified that JPMS was "responsible to honor the law wherever we are." Kras Decl., Ex. 8, at 69:20–70:10. In 2008, JPMS paid $138,957 for fifty-six JPMS registrations in China, which included a "lab testing fee." Kras Decl., Ex. 8, at 82:11–84:6; Kras Decl., Exs. 31–32; Declaration of Mark Schaub ("Schaub Decl.") ¶ 4, Ex. D, Mar. 5, 2025. JPMS was told by its agent that it was running lab tests to register its products. Kras Decl., Ex. 33, at 147:12–148:8; Kras Decl., Ex. 34. Despite the explicit Chinese testing requirement and JPMS paying for registrations and lab fees, JPMS represented in open court that before 2015 there was "no enforcement" of the animal testing requirement and represented in discovery responses that animal testing was not required. Kras Decl., Ex. 35, at 21:15–22:7; Kras Decl., Ex. 24, at Resp. No. 3. But JPMS knows that, with respect to its products, animal testing was occurring in China from 2001 to 2010.

In 2011, aware that animal testing was required, the People for the Ethical Treatment of Animals ("PETA") reached out to JPMS to ask questions about its Chinese operations. Kras Decl., Ex. 36. Even though JPMS was or should have been aware of Chinese regulations, had been alerted to the requirement for lab tests, and paid for lab testing fees, JPMS reached out to its agent in China to verify whether animal testing occurred. Kras Decl., Ex. 36. Its agent confirmed that it had performed animal testing to register products in China. Kras Decl., Ex. 33, at 194:1–197:21; Kras Decl., Ex. 37. Rather than admit its agent had been conducting animal testing in China, JPMS told PETA that it was just in early registration attempts and had decided not to pursue registration in China. Kras Decl., Ex. 38. Under oath, Jacobellis admitted that this statement was false. Kras Decl., Ex. 8, at 96:16–99:9; Kras Decl., Ex. 39. To the contrary, JPMS had been registering products for at least ten years. Dkt. 28-4; Kras Decl., Ex. 23 at Resp. No. 1; Kras Decl., Ex. 24, at Resp. No. 4. When PETA pushed back on this claim, JPMS lied by omission, allowing PETA to assume that it was not JPMS selling the products it had registered in

China but rather a distributor who sold the products without registering them. Kras Decl., Ex. 38. Because of this false narrative, PETA gave JPMS a Courage in Commerce award for not selling in China. Kras Decl., Ex. 40; Kras Decl., Ex. 33, at 208:8–18. Brenda DuVal, JPMS's Executive Vice President of Research and Development, as recently as 2021 admitted that the award "was basically an admission of guilt – aka animal testing." Kras Decl., Ex. 41, at JPMS-00011764. And Jacobellis admitted at his deposition that before 2011, JPMS's products were tested on animals in China. Kras Decl., Ex. 8, at 37:20–39:3.

Even worse, JPMS, at the time it received the PETA award, was already exploring ways to continue to register and sell its products in China. Kras Decl., Ex. 42, at JPMS-00012148. By 2012, JPMS began working with a new individual in China, Randy Xu, to resume registering products there. *Id.*; Kras Decl., Ex. 8, at 114:18–19, 114:25–115:10. Xu, who had no experience importing cosmetics into China, joined with JPMS to form JPMS Cosmetics (Beijing) Co., Ltd. ("JPMS Beijing") in China, and JPMS formed and appointed JPMS Beijing to act as its domestic responsible agent in China. Kras Decl., Exs. 43–46; Kras Decl., Ex. 8, at 116:6–14; Kras Decl., Exs. 17–19. Because there was no allowance in Chinese regulations to use alternative testing to register hair-care products in China, or any available exemption from animal testing, JPMS had to come up with a way to get around those regulations to sell in China. So JPMS concocted a scheme to attempt to (or appear to) register hair-care products in China ██████████ ████████████ Kras Decl., Exs. 45–47. █████████████████████████ ██████████████—to work with the Beijing Institute of Drug Control ("BIDC"), a lab in China that is certified to perform animal testing to register products in China. Kras Decl., Ex. 47; Kras Decl., Ex. 48 at JPMS-B-00029532. From the beginning, JPMS knew MatTek was not a solution that would allow JPMS to sell in China and avoid animal testing. These tests did not satisfy the animal-testing requirement, and even trying to use them meant animal testing would still occur. As Xu told Jacobellis, "BIDC needs to do a comparative study with our products to test results between animal and non-animal tests." Kras Decl., Ex. 49. Jacobellis stated that he would have to talk to JP, meaning John Paul DeJoria, JPMS's founder. Kras Decl., Ex. 8, at 164:22-165:5. Jacobellis then responded to Xu: "we are ok with your

recommendation below."[3] Kras Decl., Ex. 50. JPMS then entered into a Cooperation Agreement with the Beijing Institute of Drug Control ("BIDC"). Kras Decl., Ex. 8, at 171:13–172:14; Kras Decl., Ex. 48. BIDC In the Cooperation Agreement, BIDC agreed to both:

> 3) Implementing the alternative cosmetics toxicological experimental study by taking [sic] the Mat Tek lab or other similar alternative methods. Promoting alternative toxicological tests methods to be the national standard for cosmetics tests.

> 4) Doing the toxicological test to JPMS's products; Submitting data collected from toxicological test based on JPMS's products to SFDA and getting import licenses.

Kras Decl., Ex. 48 at JPMS-B-00029534. The Cooperation Agreement authorized BIDC to perform both the alternative testing using MatTek tissues and toxicological tests on animals. Toxicological tests are identified in the Chinese regulations and being performed on animals. *See* Dkt. 28-2 at 133–34 (setting forth "Methods of Toxicological Tests," which includes skin and eye irritation test); 28-3 at 9–11 (same).

JPMS registered sixty-three products China from 2015 to 2021. Kras Decl., Ex. 23, at Resp. No. 1; Kras Decl., Ex. 24, at Resp. No. 4. JPMS claims that by doing alternative testing on MatTek tissues, it was given an exemption to animal testing in China. Dkt. 56 ¶ 197; Kras Decl., Ex. 23, at Resp. No. 2; Kras Decl., Ex. 24, at Resp. No. 3. But none of those registrations were obtained without animal testing. At best, BIDC, on behalf of JPMS used comparative testing— meaning it tested its products on both animals and the MatTek tissue to compare the results— with the animal testing ultimately being the only tests that satisfied Chinese law and secured the registrations. Kras Decl., Exs. 53–54 (showing purchase of animals and other materials for animal tests); Kras Decl., Exs. 55–57; Schaub Decl. ¶ 4, Exs. A, C. JPMS also produced one (and only one, out of sixty-five) full application. The registration was for Paul Mitchell Super

---

[3] Jacobellis testified that he was not approving the comparative testing but agreeing to the proposed language in the MOU with BIDC, even though the plain language of the emails does not support his claim. Kras Decl., Ex. 8, at 166:4–168:6. Additionally, the proposed language he agreed to drop was "and JPMS does not allow or condone animal testing of any type on any JPMS product," in the MOU with BIDC. Kras Decl., Ex. 50; *see also* Kras Decl., Ex. 51(dropped language does not appear in the MOU). And Jacobellis was told by another employee that by entering into the MOU, JPMS was agreeing to animal testing. Kras Decl., Ex. 52.

Skinny Conditioner in China (in Chinese), and it shows that animal testing was performed to register that product. Kras Decl., Exs. 58–59; Schaub Decl. ¶ 4, Ex. B. The application for registration (which Plaintiffs had translated) describes in detail the animals used to perform the testing and the testing itself, specifically how the lab performed the skin irritation test on four white rabbits and performed the acute eye irritation tests on three white rabbits. Kras Decl., Ex. 59, at JPMS-00021033–36. Like all the other products JPMS registered in China, it lists JPMS as the applicant and JPMS Beijing and JPMS's responsible agent in China. *Id.* at JPMS-00021026.

Further destroying their cover story, ████████████████████████████████████████ ████████████████████████████████████████████. MatTek produced ████████████████████████████████████████████████. Kras Decl., Ex. 60, at141:20-142:6. A review of those records in conjunction with MatTek's testimony regarding how many tissues are required to test a product reveals that, at best,[4] ████████████████ ████████████████████████████████████[5] Declaration of Tory Beardsley ("Beardsley Decl.") ¶ 7, Ex. 1. During this same period JPMS registered twenty-eight products in China (Dkt. 28-5), meaning ████████████████████████ all the products registered in China.[6]

Worse still, ████████████████████████████████████████████ ██ Kras Decl., Ex. 60, at 150:11–19; Beardsley Decl. ¶ 10 & Ex. 1. This means ████████████



████████████████████████████ on the thirty-five products JPMS registered in China between 2019 and 2021 because ███████████████████████.[7] As JPMS was the party paying for the MatTek tissues, it knew that ████████████████████████████ ████████████. Kras Decl., Exs. 62–63. Even assuming *some* of the products registered between 2019 and 2021 were the result of a years-long registration process, ████████████ ████████████████████████—nowhere close to the 63 total products it registered.

JPMS internally suspected or knew that its products were being tested on animals to obtain registrations in China. Brenda DuVal questioned on multiple occasions whether JPMS was performing animal testing, stating: "my concern is that they may do both (animal and MatTek) tests for confirmation;" "This doesn't feel very good. Seems we are still relying on the animal testing to register these products;" "This proves to me that not all products have been tested properly;" "In my opinion, until we can openly say our products are there legally and without animal testing, our products should not be there at all;" and "the documents we received are the import approval certificates from the FDA, there is no difference between those we received (presumably without animal testing) and those that we would have received with animal testing." Kras Decl., Ex. 64, at JPMS-00009428; Kras Decl., Ex. 65, at JPMS-00000852; Kras Decl., Ex. 66, at JPMS-00021510; Kras Decl., Ex. 67, at JPMS-00005873. Luke Jacobellis also expressed concerns: "Randy, I must tell you that your response is disturbing to me. From day one, getting product through the Chinese regulators and allowing us to claim no animal testing has been your responsibility. . . . I ask you....what is your plan????;" "We are being accused of not being truthful or we have fallen back on the original approvals that were done with animial [sic] testing. . . IT is now making us question everything that we have don't [sic] to date. Something is not making sense." Kras Decl., Ex. 68, at JPMS-00002715; Kras Decl., Ex. 69, at JPMS-00002703. Despite Jacobellis agreeing that JPMS should have a copy of the exemption,

---

[7] Similarly ███████████████████████████████████████████████████████. JPMS obtained a product registration on March 9, 2018, ████████████. Dkt. 28-5 at 3; Beardsley Decl., Ex. 1.

both DuVal and Jacobellis admitted that JPMS never received anything showing that JPMS had an exemption from animal testing or that their products were being tested solely with MatTek tissues. Kras Decl., Ex. 33, at 112:16–23, 134:19–137:2; Kras Decl., Ex. 8, at 73:2–17; 137:22–139:20. JPMS has represented that it has an exemption, but it produced no documentary evidence of an exemption and produced no witnesses with firsthand knowledge of an exemption. Dkt. 56 ¶ 197 ("JPMS admits and maintains it obtained an exemption from China and did not animal test."); Kras Decl. ¶ 96.

Publicly, JPMS represented that it was not animal testing, announcing: "John Paul Mitchell Systems is pleased to announce it has successfully gained acceptance to market select Paul Mitchell and Tea Tree products in China—without animal testing . . . John Paul Mitchell Systems is able to service hairstylists and guests in China while maintaining its core corporate value of zero animal testing." Dkt. 28 ¶ 194; Dkt 56 ¶ 194; Kras Decl., Ex. 70. It also claimed in another release "Since the Paul Mitchell brand was founded in 1980, we have always adhered to our strict no-animal testing policy and will continue to do so in the future. We are proud to be the first professional beauty company to announce that we don't conduct or condone animal testing." Kras Decl., Ex. 71, at JPMS-00021568.

To quantify the financial harm to purchasers of JPMS's products in the United States, Plaintiffs hired Gareth Macartney, Ph.D., the Senior Economist at OnPoint Analytics, to develop a methodology to calculate damages. Kras Decl., Ex. 72. Dr. Macartney determined that consumers are willing to pay, and do pay, more for cruelty-free products. *Id.* ¶¶ 9–10, 13–32. Specifically, Dr. Macartney, relying on scholarly research and market studies, found and measured the price premium for cruelty-free products. *Id.* ¶¶ 26–32. He then laid out two methodologies to measure that price premium—a hedonic regression and a conjoint—discussed in more depth below. *Id.* ¶¶ 37–49. Each of these, when applied to JPMS's data, can determine the aggregate financial harm to the Class.

### III.    ARGUMENT

Plaintiffs must demonstrate that "each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)" have been met. *Zinser v. Accufix Research Inst., Inc.*, 253

F.3d 1180, 1186 (9th Cir. 2001). "Any doubts regarding the propriety of class certification generally should be resolved in favor of certification." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 481 (N.D. Cal. 2011).

Although the Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of plaintiff's underlying claim,' . . . Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). So "[m]erits questions may be considered to the extent–but only to the extent–that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011) (it is inappropriate to "determine whether class members could actually prevail on the merits of their claims"). It is also "critical to keep in mind that class certification is different from summary judgment. A court is merely to decide whether a class action is a suitable method of adjudicating the case." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (cleaned up), cert. denied, 2025 WL 663695 (U.S. Mar. 3, 2025).

This case meets the requirements of Rule 23(a) because: (1) the Class is so numerous that joinder is impracticable; (2) there are questions of law or fact common to the Class; (3) the claims of the Class representatives are typical of the claims of the Class; and (4) the Class representatives will fairly and adequately protect the interests of the Class. The case also meets the predominance and superiority requirements of Rule 23(b)(3).

## A. The Class is identifiable.

The proposed Class definition provides "objective criteria" to identify its members. *See Farar v. Bayer AG*, No. 14-CV-04601-WHO, 2017 WL 5952876, at *13 (N.D. Cal. Nov. 15, 2017). "While ascertainability may factor into evaluation of a proposed definition of a class, the Ninth Circuit has never adopted an ascertainability requirement." *Id.* (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4 (9th Cir. 2017)).

The operative complaint defines the Class as:

> All individuals who, between May 1, 2015, and June 30, 2022,
> purchased, directly from JPMS or through an authorized third-
> party retailer or salon, a John Paul Mitchell Systems Inc. hair-care
> product branded as Paul Mitchell®, Clean Beauty, Tea Tree,
> MITCH®, Awapuhi Wild Ginger®, Neuro®, or MVRCK™.

In the concurrently filed proposed Second Amended Complaint ("SAC"), the Class is defined the

same, except the Class period is extended from June 1, 2001 to the present:

> All individuals who, between June 1, 2001 to the present,
> purchased, directly from JPMS or through an authorized third-
> party retailer or salon, a John Paul Mitchell Systems Inc. hair-care
> product branded as Paul Mitchell®, Clean Beauty, Tea Tree,
> MITCH®, Awapuhi Wild Ginger®, Neuro®, or MVRCK™.

Both definitions are straightforward, requiring only that a consumer purchased a JPMS haircare

product in a particular time period.

**B.      The case meets the requirements of Rule 23(a).**

This case meets the requirements of Rule 23(a) because: (1) the Class is so numerous that

joinder is impracticable; (2) there are questions of law or fact common to the Class; (3) the

claims of the Class representatives are typical of the claims of the Class; and (4) the Class

representatives will fairly and adequately protect the interests of the Class.

**1.      The Class is sufficiently numerous.**

"Rule 23(a)(1) requires that a proposed class be so numerous that joinder of all members

is impracticable. While there is no fixed number that satisfies the numerosity requirement, courts

often find that a group greater than 40 members meets such requirement." *Scholl v. Mnuchin*,

489 F. Supp. 3d 1008, 1043 (N.D. Cal. 2020) (citing Fed. R. Civ. P. 23(a)(1)). "Plaintiffs need

not state an exact number to meet the threshold requirements of Rule 23. . . . In analyzing

numerosity 'a court may make common-sense assumptions and reasonable inferences.'" *West v.*

*California Servs. Bureau, Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017) (quoting *The Civil Rights*

*Educ. & Enforcement Ctr. v. RLJ Lodging Trust*, 2016 WL 314400, at *6 (N.D. Cal. 2016)).

In this case, JPMS has sold ███████ of hair-care products from 2015 to 2020, totaling

over ████████████ Kras Decl., Ex. 72, at ¶ 49. This is sufficient to show that the Class meets

the numerosity requirement. Common sense dictates that the Class has more than forty members,

and that joinder would be impractical. *See Hawkins v. Kroger Co.*, 337 F.R.D. 518, 533 (S.D. Cal. 2020) (finding common sense dictates numerosity where "total sales of Kroger breadcrumbs in California between 2010 through 2015 to be around $2 million" representing "the sale of hundreds of thousands of containers of breadcrumbs"); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350–51 (N.D. Cal. 2005) ("In addition, the fact that a class is geographically dispersed, and that class members are difficult to identify, supports class certification."). This reasonable estimate is confirmed by the fact that Plaintiffs' counsel have received hundreds of inquiries from Class members. Kras Decl. ¶ 97.

## 2.    There are questions of law and fact common to the Class, satisfying Rule 23(a)(2).

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." "Commonality exists where class members' 'situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.'" *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (citation omitted). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. "Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "[C]lass action plaintiffs are not required to actually prove their case through common proof at the class certification stage. Rather, plaintiffs must show that they will be able to prove their case through common proof at trial." *Lytle*, 114 F.4th at 1024.

Plaintiffs can establish that there are common issues of fact and law. Plaintiffs and all Class members purchased JPMS products. JPMS made specific, but nearly identical, promises to Plaintiffs and the Class on its packaging, specifically that JPMS was "A Pioneer in Cruelty Free Hair Care," JPMS did "No Animal Testing," and "John Paul Mitchell Systems does not conduct

or endorse animal testing." JPMS also advertised, including on its website and on social media,

No Animal Testing. Never Have. Never Will," and that it was "cruelty-free since 1980."[8] These

promises all mean the same thing: JPMS has maintained for forty-five years that it has **never**

animal tested. Plaintiffs will prove through common evidence JPMS broke that promise by

testing its products on animals for twenty years to sell products in China. Specifically, Plaintiffs

will show that JPMS paid for registrations from 2001 to 2011 that required animal testing, JPMS

went back to China to register products and never obtained its claimed exemption from Chinese

regulations, that JPMS did not (and could not have) run the alternative tests it claimed to run to

register its products in China, and that JPMS's applications to the NMPA detail how it tested on

animals. This is all common evidence that will prove Plaintiffs' and the Class's claims.

On the breach of warranty, common questions include whether JPMS represented that it

did not test on animals, whether this promise was a part of the basis of the bargain, whether

JPMS breached that promise by testing on animals in China, and whether Plaintiffs and the Class

were injured by JPMS's conduct, including by purchasing products they would not have

purchased or by paying more for those products. And as the breach of warranty claim is a UCC

claim, it can be applied to a nationwide class. The UCC "shall be liberally construed and applied

to promote its underlying purposes and policies, which are . . . to make uniform the law among

the various jurisdictions." Cal. Com. Code § 1103. "If there are no material differences in the

laws of the different jurisdictions, the trial court may apply California law." *Am. Licorice Co. v.

Total Sweeteners, Inc.*, No. C-13-1929 EMC, 2013 WL 4396778, at *5 (N.D. Cal. Aug. 13,

---

[8] JPMS submitted the expert report of Dr. Dominque Hanssens to claim that there was no

████████████████████████████████████████ Kras Decl., Ex. 7, ¶ 59. But Dr. Hanssens own
report belies this conclusion. ████████████████████████████████████████

████████████████████████████████████████████████████████████████ *Id.*
¶¶ 57–58. ████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.*

2013). There, the court found no conflict because the states adopted the UCC without "without any modifications that are relevant to the issues here." *Id.* "The fact that two or more states are involved does not itself indicate that there is a conflict of law problem. A problem only arises if differences in state law are material, that is, if they make a difference in this litigation." *Cover v. Windsor Surry Co.*, No. 14-CV-05262-WHO, 2016 WL 520991, at *6 (N.D. Cal. Feb. 10, 2016).

As a backstop to fully protect each Plaintiff's rights, Plaintiffs seek to amend their Complaint to add UCC breach of express warranty claims for their home states (Oklahoma, Texas, and Virginia). These claims (and underlying statutes) are identical to the California UCC breach of warranty claim. To the extent there are differences between how the states apply the UCC, those differences can be resolved by, either creating appropriate subclasses to facilitate the application of Rule 23 to each, and naming Plaintiff Guerrero as the Class representative for a Texas class, naming Plaintiff Gonnella as the Class representative for a Virginia class, and naming Plaintiffs Rohloff and Rule as the Class representatives for an Oklahoma class.[9]

Plaintiffs' CLRA, FAL, and UCL claims likewise present common questions, including whether JPMS's cruelty-free and no-animal-testing promises were misrepresentations; whether a reasonable consumer would have been deceived by JPMS's misrepresentations; whether Plaintiffs and the Class relied on JPMS's representations; and whether JPMS's conduct constitutes an unlawful, unfair, or deceptive business practice. The controlling law is also common to the Class because JPMS's misrepresentations and schemes to hide its misrepresentations were devised and executed at its headquarters in California. When a party seeks to certify a nation-wide class for claims arising under the law of the forum state, that party must show that the forum state has "a significant contact or aggregation of contacts to the claims asserted by each member of the plaintiff class, contacts creating state interests, in order to ensure that the choice of state law is not arbitrary or unfair." *Parkinson v. Hyundai Motor Am.*, 258

---

[9] If the Court does not find a nationwide class or subclasses appropriate, Plaintiffs request permission to amend their complaint to add additional plaintiffs to bring UCC claims for additional states. Such requests are routinely granted. *E.g. Hernandez v. Balakian*, 251 F.R.D. 488, 491 (E.D. Cal. 2008) (granting leave to substitute class representative after certification).

F.R.D. 580, 597 (C.D. Cal. 2008) (cleaned up). As outlined herein, JPMS executed a twenty-year scheme to maximize its profits by entering the Chinese market—an action that required animal testing—all the while presenting itself as a cruelty-free company—on its bottles, its website, social media, and in advertising. As all of JPMS's wrongful acts emanated from California, the application of California law is appropriate.[10] *Id.* (finding California law could apply where the wrongful acts emanated from California).

### 3. Rule 23(a)(3) is met because Plaintiffs' claims are typical of the Class's claims.

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin*, 617 F.3d at 1175 (quotation omitted). Plaintiffs' claims "are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012) (citation omitted). Typicality is readily satisfied in cases like this one, where all Class members have suffered a "similar injury . . . and that injury is due to the [defendant's] same conduct." *Frlekin v. Apple Inc.*, 309 F.R.D. 518, 522 (N.D. Cal. 2015).

Plaintiffs have no individual claims that differ from the Class's claims. Each Plaintiff purchased JPMS products, JPMS's advertisements and products themselves promised that JPMS never tested on animals and that its products were cruelty free, and those promises became a part of the basis of the bargain. As outlined herein, Plaintiffs will show that JPMS registered 165 products in China, over a twenty-year period, and each registration required that JPMS perform animal testing. A reasonable jury could conclude, based on this evidence, that JPMS breached its promise to consumers that it never tested on animals. Like Plaintiffs, all Class members purchased JPMS products, so they were all made the same promise, and are entitled to the same

---

[10] In the alternative, if the Court finds that California law cannot apply to a nationwide class, Plaintiffs ask the Court to certify a class of California residents who, between June 1, 2001 to the present, purchased, directly from JPMS or through an authorized third-party retailer or salon, a John Paul Mitchell Systems Inc. hair-care product branded as Paul Mitchell, Clean Beauty, Tea Tree, MITCH, Awapuhi Wild Ginger, Neuro, or MVRCK. Plaintiffs also ask the Court to appoint Randall Heagney as the Class representative for the California Class, as he resides in California.

recovery. JPMS's alleged animal testing predated every purchase by the members of the proposed Class.  Plaintiffs will use the common evidence to prove their claims and the Class's claims. Plaintiffs meet the typicality requirement.

### 4.    Adequacy is satisfied under Rule 23(a)(4).

Plaintiffs and their counsel meet the adequacy requirements. "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon*, 150 F.3d at 1020). Adequacy depends on an "absence of antagonism" and a "sharing of interest" between Class representatives and absentee class members. *Id.* The Plaintiffs' interests are aligned with those of the Class, and there are no conflicts or antagonism—they have suffered the same economic loss when they purchased JPMS hair-care products. Plaintiffs have also fulfilled their duties to the Class and will continue to fulfill their duties. Each Plaintiff responded to JPMS's discovery requests, sat for depositions, understood their roles as Class representatives, and have no interests adverse to the Class. Kras Decl. ¶ 10; Kras Decl., Ex. 11, at 170:14–15, 181:3–13; Kras Decl., Ex. 12, at 157:20–158:8, 168:13–18; Kras Decl., Ex. 13, at  36:23–37:4, 53:1–54:8, 66:11–23; Kras Decl., Ex. 14, at 161:11–23, 174:25–175:12; Kras Decl., Ex. 15, at 127:2–6, 140:12–16. Plaintiffs have adequately prosecuted their cases.

Robert Carey of Hagens Berman Sobol Shapiro LLP is adequate counsel. Hagens Berman has extensive experience in complex and class-action litigation, including consumer-protection class actions, which stem from a full range of deceptive, unfair, and fraudulent business practices. Mr. Carey has been appointed Class counsel in numerous class actions. Kras Decl., Ex. 73.

### C.    The Class meets the requirements of Rule 23(b)(3).

Certification is warranted under Rule 23(b)(3) because "the questions of law or fact common to members of the class predominate over any questions affecting only individual

members," and "a class action is superior to other available methods for the fair and efficient" settlement of the controversy. Plaintiffs can meet both factors.

   1.   **The Class meets the predominance test.**

   "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). For "the predominance inquiry specifically, a district court must evaluate 'the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove the common question in one stroke.'" *Lytle*, 114 F.4th at 1023 (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022)). "In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Id.* (quoting *Olean*, 31 F.4th at 666–67). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (citation omitted). Common issues predominate here.

   a.   **Breach of Express Warranty**

   "To plead a claim for breach of express warranty, the buyer must allege that the seller "(1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff." *Blennis v. Hewlett–Packard Co.*, No. C 07–00333, 2008 WL 818526, at *2 (N.D. Cal. Mar.25, 2008) (citation omitted).

Here, Plaintiffs will show there is a common promise made on every bottle—that JPMS is "A Pioneer in Cruelty Free Hair Care," that JPMS does "No Animal Testing," and "John Paul Mitchell Systems does not conduct or endorse animal testing." These promises, which appeared on all JPMS's bottles, form part of the basis of the bargain as a matter of law. *Karim v. Hewlett-Packard Co.*, No. C 12-5240 PJH, 2014 WL 555934, at *6 (N.D. Cal. Feb. 10, 2014) (quoting *Keith v. Buchanan*,173 Cal.App.3d 13, 23 (1985)) ("[a] warranty statement made by a seller is presumptively part of the basis of the bargain, and the burden is on the seller to prove that the resulting bargain does not rest at all on the representation."). Plaintiffs have identified common evidence that can establish that the warranty was breached. Specifically, Plaintiffs will present evidence that Chinese law required animal testing from 2001 to 2021 and JPMS registered sixty-five products during that time period, that JPMS paid for the registrations and animal testing, that JPMS's applications to the NMPA showed animal testing occurred, that JPMS's internal communications indicate that animal testing occurred well before the purchases of the Class, and JPMS's claim of using alternative testing is demonstrably false. "The answers to these inquiries will also be in common. Because exactly the same representations were made to all class members via product packaging," and there is common evidence that shows JPMS performed animal testing during the Class period. *Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 599 (N.D. Cal. 2021); *see also* Fed. R. Civ. P. 23 advisory committee's note (predominance is appropriately found where "a fraud [is] perpetrated on numerous persons by the use of similar misrepresentations"). Plaintiffs will show that on a classwide basis, that JPMS's conduct in China breached its express warranties to every member of the Class.

### b.    California Consumer Legal Remedies Act ("CLRA")

A CLRA claim requires: "(1) a misrepresentation; (2) reliance on that misrepresentation; and (3) damages caused by that misrepresentation." *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1112 (N.D. Cal. 2016). Plaintiffs have common evidence that JPMS made misrepresentations in violation of the CLRA, specifically Cal. Civ. Code § 1770(a)(1) (misrepresenting the certification of goods), (a)(7) (representing goods are of a particular

standard or quality), and (a)(9) (advertising goods with the intent not to sell them as advertised). Plaintiffs will use the common evidence cited herein to establish that JPMS misrepresented it was cruelty free and it never tested on animals, while testing on animals in China. Plaintiffs can also use common evidence to establish reliance, because JPMS's representations were material. "Although reliance and materiality are separate elements, under the CLRA, a plaintiff can create a presumption of reliance by demonstrating a material misrepresentation was made to the entire class." *Lytle*, 114 F.4th at 1022. "[U]nder the CLRA, causation, on a classwide basis, may be established by materiality. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class. A misrepresentation is material if a reasonable person would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* at 1034.

Here, there is common evidence to establish materiality. "Materiality can be shown by a third party's, or defendant's own, market research showing the importance of such representations to purchasers." *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *8 (N.D. Cal. July 15, 2016). JPMS's own documents establish that JPMS's cruelty-free stance is material to its consumers. For example, JPMS produced ██████████████████████ ████████████████████████████████████████████████████ Kras Decl., Ex. 74, at 177475–76. ████████████████████ ████████████████████████ *Id.* at JPMS-00177509. ██████████████████████ ████████████████████████████████████████ ████████████████████ *Id.* at JPMS-00177537. In a Social Media Report" that JPMS produced, it found that one of JPMS's top Facebook posts was a model holding a rabbit stating, "No Animal Testing Never Have Never Will," captioned "John Paul Mitchell Systems is, and always will be, cruelty-free." Kras Decl., Ex. 75, at 127197. JPMS's top Instagram post for that same time period included the same image. *Id.* at JPMS-00127207. The recommendation was to: "Increase posts that tell the brand story: … Brand values such as No Animal Cruelty." *Id.* at JPMS-00127224. Other marketing materials show that ██████████████████████████ ████████████████████████████████████████████████████████

██████████████████████████████████████████████ Kras Decl., Ex. 76,

at 109769, 109782, 109783. In marketing materials, JPMS also states that "a pioneer in cruelty-

free cosmetics" is one of its main sustainability pillars and identifies ████████████████

████████████████████████ Kras Decl., Ex. 77, at 10368–69, 110374; Kras Decl., Ex.

78, at 169510-11.

And Plaintiffs' damages expert, Dr. Gareth Macartney, cites multiple studies showing

that a cruelty-free representation is important to consumers. Kras Decl., Ex. 72, at ¶¶ 14–20. This

common evidence is enough to show that a jury could find JPMS's representations were material

to a reasonable consumer. *See Lytle*, 114 F.4th at 1034 ("Because materiality (and, hence, in this

case reliance) may be proved by reference to an objective, reasonable consumer standard,

reliance under the CLRA is generally susceptible to common proof.").

JPMS attempts to undermine its own internal documents on materiality by submitting the

testimony of Dr. Dominique Hanssens, who conducted an open question survey to ask what

factors were the most important to them in their most recent purchase of hair-care products.

Putting aside that this does not measure consumers' attitudes towards animal testing, it is

immaterial. "To establish reliance under the CLRA, a misrepresentation need not be 'the sole or

even the decisive cause of the injury-producing conduct.'" *Lytle*, 114 F.4th at 1036 (quoting

*Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020)). Even crediting Dr.

Hanssens' conclusions disputing JPMS's own documents, it would not defeat certification.

Rather, disputes about materiality "are issues to be ultimately resolved by the jury."

*Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 565 (N.D. Cal. 2020) (finding Dr. Hanssens'

conclusions disputing materiality were for the jury). "Plaintiffs presented ample evidence to

show that the challenged statements would be materially misleading to a reasonable consumer."

*Lytle*, 114 F.4th at 1035.

### c.    California False Advertising Law ("FAL")

To bring a claim under the FAL a plaintiff must establish: (1) "a loss or deprivation of

money or property sufficient to qualify as injury in fact, i.e., economic injury," and (2) "that that

economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Ivie v. Kraft Foods Glob., Inc.*, 961 F. Supp. 2d 1033, 1046 (N.D. Cal. 2013). Plaintiffs "must show that reasonable consumers are likely to be deceived by the label." *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1193 (N.D. Cal. 2014). "Whether a reasonable consumer would be deceived by a product label is generally a question of fact." *Id.* As established above, Plaintiffs have identified common evidence of a false advertisement and economic injury—Plaintiffs would not have purchased the products or paid as much for the products without the false advertisement.

### d.    California Unfair Competition Law ("UCL")

The UCL prohibits acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Here Plaintiffs can establish with common evidence that JPMS violated the unlawful and unfair prongs of the UCL through its deceptive practices and advertisements.

Plaintiffs will prove, on a classwide basis, JPMS violated the unlawful prong of the UCL. The "UCL authorizes injured consumers to 'borrow' violations of other laws for purposes of establishing UCL liability," which includes FAL and CLRA claims. *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 922 (N.D. Cal. 2013). Because Plaintiffs can prove their CLRA and FAL claims on a classwide basis, they can similarly establish their UCL claim under the unlawful prong.

"UCL plaintiffs must point to a misrepresentation with particularity and plead that the misrepresentation 'was an immediate cause of the injury-producing conduct, but not necessarily the sole or even the predominant or decisive factor.'" *Pirozzi*, 966 F. Supp. at 920 (quoting *In re Tobacco II Cases*, 207 P.3d at 39). A UCL violation is shown if members of the public are likely to be deceived by the misrepresentation. *Ehret,* 148 F. Supp. 3d at 895; *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015). "An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefit to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."

*Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1137 (N.D. Cal. 2010) (quoting *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 118, 129 (Ct. App.2006)). And "California courts have repeatedly held that relief under the UCL is available without individualized proof of deception, reliance and injury." *Mass. Mut. Life Ins. Co. v. Super. Ct.*, 119 Cal. Rptr. 2d 190, 193 (Ct. App. 2002), *as modified on denial of reh'g* (May 29, 2002).

Here, Plaintiffs have alleged specific representation made to every Class member on JPMS's bottles, but also in its advertising. Plaintiffs also have common evidence that JPMS tested on animals in China. JPMS's promise that its products were never tested on animals—both on the packaging and in advertisements—made to every Class member, is a misrepresentation under the UCL.

**D.    Damages**

At the class-certification stage, Plaintiffs need only show that "damages can be determined without excessive difficulty and attributed to their theory of liability." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017). "[C]lass action plaintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof so long as the district court finds . . . that the model will be able to reliably calculate damages in a manner common to the class at trial." *Lytle*, 114 F.4th at 1024. There is no "requirement that class action plaintiffs actually prove that classwide damages exist in order to obtain class certification." *Id.* at 1025. Class treatment is appropriate "even where such calculations have not yet been performed." *Id.*

Here, Dr. Macartney has put forth two methodologies for calculating classwide damages: a hedonic regression and a conjoint analysis. First, Dr. Macartney identifies how he would design a hedonic regression and identifies that data that is available and capable of performing the hedonic regression. Dr. Macartney explains that the "hedonic method uses data on actual retail sales prices and various product attributes and labels, both of which are commonly available from market research firms that track actual point-of-sale purchases (e.g., Nielsen, Circana (formerly IRI and NPD), and Mintel) . . . [and t]he model can identify the effect of

cruelty-free labels on actual retail sales prices, while controlling for other product attributes that influence retail prices." Kras Decl., Ex. 72, at ¶ 39. He then describes how the regression model works. *Id.* ¶¶ 40–43. Second, Dr. Macartney sets forth how he would to design a conjoint analysis. He explains that "[t]o elicit the relative value of product features, consumers' preferences are collected through survey responses to hypothetical yet realistic choice scenarios, which are experimentally controlled and described in terms of the product's attributes." *Id.* ¶ 45. He then describes how the conjoint will account for both demand-side and supply-side factors. *Id.* ¶ 46. He explains that the conjoint will predict a consumers' willingness to pay "for the attribute of interest, for instance cruelty-free." *Id.* ¶ 47. These two methodologies are sufficient to establish a "method of proof would apply in common to all class members, not whether the method of proof would or could prevail." *Lytle*, 114 F.4th at1026 (quoting *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 12 (1st Cir. 2019)).

Courts have repeatedly approved of these types of damages methodologies when certifying a class. For example, Judge Orrick recently found in this district that "hedonistic-regression models are based on real world transactions and real world data regarding price and other variables." *Rushing v. Williams-Sonoma, Inc.*, No. 16-CV-01421-WHO, 2024 WL 779601, at *18 (N.D. Cal. Feb. 21, 2024). That is precisely what Dr. Macartney has done here, identifying the real-world data and transactions he will use to create his model. While JPMS "may offer to the jury evidence of its pricing strategies to rebut or challenge the damages produced by" Dr. Macartney's model, that does not defeat certification. *Id.* Similarly, Judge Donato recently found that a conjoint analysis could be used to calculate damages. *Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 600 (N.D. Cal. 2021) (approving of conjoint methodology "to isolate and quantify the market price premium associated with the challenged claims and omissions, which then can be used to calculate the amount of restitution and damages owed" to the Class). In approving the use of a conjoint, the court found that "courts that have accepted the proposed conjoint analysis have reached the better conclusion." *Id.* at 601 (citing *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018)). This Court has also approved of a conjoint analysis for class damage calculations. *Wallenstein v. Mondelez Int'l, Inc.*, No. 22-CV-06033-VC, 2024 WL

4293904, at *2 (N.D. Cal. Sept. 25, 2024) ("expert reports explaining that this case is suitable for a price premium damages model using conjoint analysis [] is sufficient at the class certification stage"). Dr. Macartney's proposed damages methodologies provide two viable means of establishing damages through common proof, each satisfying the requirements for class certification under Rule 23.

JPMS submits the testimony of Dr. Keith Ugone, criticizing Dr. Macartney's methodologies as being undeveloped. But "[t]he question now is not whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury." *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 294 (N.D. Cal. 2017) (citation omitted). The certification stage is not "the proper forum in which to resolve this battle of the experts." *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005) (cleaned up).

### 1. A class action is the superior method of adjudicating this case.

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175 (citation omitted). This case is superior for four reasons. First. the cost of hair-care products is too low to incentivize many class members to litigate their claims individually and supports concentrating the claims in a single forum. This is especially true here given the high cost of marshaling the evidence (expert and otherwise) necessary to litigate the claims at issue, and the disparity in resources between the typical class member and a well-funded, litigation-savvy defendant like JPMS. Second, a class action is superior to millions of individual suits for small amounts. Certification conserves both individual and judicial resources. Third, a class action is also superior in this case because JPMS has hidden the truth from consumers—it continues to deny that it ever tested on animals despite the overwhelming evidence—so most consumers are in the dark about being misled and damaged and would not know of their claim. Last, the extent and nature of any similar litigation also favors class certification. This is the only known suit involving these specific issues.

**E.     Manageability of the Class Action Trial**

Pursuant to the Court's standing order, Plaintiffs' counsel submit a trial plan that details how they will present their case at trial, with the common evidence cited in this Motion and their proposed jury instructions. Kras Decl., Ex. 79. Plaintiffs also file separately herewith their proposed verdict forms. As the UCL and FAL are decided by the Court, not a jury, Plaintiffs do not provide jury instructions and provide advisory verdict forms for the Court.

The only individualized issues that might arise are if the Court requires multiple classes for the UCC breach of warranty claim. At worst, that would require more than one verdict form for the UCC claims, with one or two deviations on the elements. And Plaintiffs' expert can calculate damages to correspond to each subclass, eliminating any confusion by the jury. The trial plan and verdict forms demonstrate that this case is manageable as a class action.

## IV.     CONCLUSION

Plaintiffs respectfully ask the Court to certify the following Class: "All individuals who, between June 1, 2001, to the present, purchased, directly from JPMS or through an authorized third-party retailer or salon, a John Paul Mitchell Systems Inc. hair-care product branded as Paul Mitchell®, Clean Beauty, Tea Tree, MITCH®, Awapuhi Wild Ginger®, Neuro®, or MVRCK™." Plaintiffs also request that the Court appoint Robert Carey as Class counsel and appoint Randall Heagney, Rica Guerrero, Kerrie Gonnella, John Rohloff, and Jewel Rule as Class representatives.

Dated: March 6, 2025                    Respectfully submitted,

                                        By */s/ Michella A. Kras*

                                        Robert B. Carey (*Pro Hac Vice*)
                                        Leonard W. Aragon (*Pro Hac Vice*)
                                        Michella A. Kras (*Pro Hac Vice*)
                                        E. Tory Beardsley (*Pro Hac Vice*)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        11 West Jefferson, Suite 1000
                                        Phoenix, Arizona 85003
                                        Telephone: (602) 840-5900
                                        Facsimile: (602) 840-3012
                                        Email: rob@hbsslaw.com
                                               leonarda@hbsslaw.com
                                               michellak@hbsslaw.com
                                               toryb@hbsslaw.com

                                        Shana E. Scarlett (SBN 217895)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        715 Hearst Avenue, Suite 300
                                        Berkeley, California 94710
                                        Telephone: (510) 725-3000
                                        Facsimile: (510) 725-3001
                                        Email: shanas@hbsslaw.com

                                        *Counsel for Plaintiffs and the Proposed Class*