Megan O'Neill (SBN 220147)
  moneill@dtolaw.com
Andrea Maddox (SBN 347935)
  amaddox@dtolaw.com
DTO LAW
702 Marshall Street, Suite 640
Redwood City, California 94063
Telephone:  (415) 630-4100
Facsimile:  (415) 630-4105

William A. Delgado (SBN 222666)
  wdelgado@dtolaw.com
Destiny R. Lopez (SBN 342505)
  drlopez@dtolaw.com
DTO LAW
915 Wilshire Boulevard, Suite 1950
Los Angeles, California 90017
Telephone: (213) 335-6999
Facsimile:  (213) 335-7802

*Appearances of Counsel Continued on Next Page*

Attorneys for Defendant
JOHN PAUL MITCHELL SYSTEMS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| RANDALL HEAGNEY, RICA GUERRERO, KERRIE GONNELLA, JOHN ROHLOFF, and, JEWEL RULE, individually and on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs,<br><br>    v.<br><br>JOHN PAUL MITCHELL SYSTEMS,<br><br>           Defendant. | Case No. 3:23-cv-00687-VC<br>Hon. Vince Chhabria<br><br>**DEFENDANT JOHN PAUL MITCHELL SYSTEMS'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:    May 15, 2025<br>Time:    10:00 a.m.<br>Place:   Courtroom 4-17th Floor |

Katherine Burghardt Kramer  (Admitted *pro hac vice*)
  kkramer@dtolaw.com
DTO LAW
307 5th Avenue, 12th Floor
New York, New York 10016
Telephone: (646) 995-5400
Facsimile:  (213) 335-7802

Martin D. Singer (SBN 78166)
  mdsinger@lavelysinger.com
LAVELY & SINGER
PROFESSIONAL CORPORATION
2049 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 556-3501
Facsimile:  (310) 556-3615

Attorneys for Defendant
JOHN PAUL MITCHELL SYSTEMS

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ...................................................................................2

    A.    Plaintiffs' Premature and Inaccurate Merits Inquiry. ..............................2

        1.    Misrepresentations regarding JPMS's pre-2011 activity in China. .............2

        2.    Misrepresentations regarding JPMS's exemption to the animal testing requirement in China. ........................................................3

III.  PLAINTIFFS FAIL TO SATISFY THE REQUIREMENTS OF RULE 23(B)(3).............4

    A.    Plaintiffs May Not Assert Claims on Behalf of a Nationwide Class. ......................5

        1.    Courts in the Ninth Circuit consistently hold California consumer protection claims may not be asserted on behalf of a nationwide class. ...........................................................5

        2.    Due to conflicts of laws amongst the 50 states, Plaintiffs may not assert a breach of express warranty claim on behalf of a nationwide class either. ...........................................................6

        3.    Plaintiffs may not assert their breach of express warranty claim under the state laws of Texas, Virginia, or Oklahoma. ...............................7

    B.    Individualized Issues Predominate as to Exposure to, Reliance on, and Materiality of the Challenged Statements. ...............................8

        1.    Because there was no class-wide exposure to the Marketing Statements,  there can be no presumption of materiality or reliance thereon. ...........................................................10

        2.    Proposed class members were not uniformly exposed to the Label Claims, do not share a uniform understanding of them, and do not consistently consider them to be material, meaning individualized issues predominate. ...........................................................12

            (a)    Different Label Claims were on JPMS products in the marketplace at the same time, making it impossible to know who saw what and when they saw it. ...................................12

            (b)    Proposed class members' understanding of the Label Claims varies wildly, such that individual issues predominate as to meaning. ...........................................13

            (c)    Class-wide reliance should not be presumed here given the Label Claims were not prominently featured. ...............................17

(d)     The Label Claims were not material to a large portion of the class. ........................................................................................17

C.     Plaintiffs' Damages Models Do Not Match Their Theory of Liability as Required by *Comcast*. ....................................................................20

1.     Macartney's proposed conjoint survey does not satisfy Comcast. ............21

2.     Macartney's proposed hedonic regression does not satisfy Comcast..........................................................................................22

D.     Trying This Case as a Class Action Is Neither Superior nor Manageable.............23

IV.     PLAINTIFFS FAIL TO MEET RULE 23(A)'S ADEQUACY REQUIREMENTS ........24

V.     CONCLUSION.................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*,
  2017 WL 2559615 (C.D. Cal. June 7, 2017) .........................................................13, 16, 18, 19

*Algarin v. Maybelline, LLC*,
  300 F.R.D. 444 (S.D. Cal. 2014) ...........................................................................................19

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013) ...................................................................................9, 16, 20

*Black Lives Matter L.A. v. City of L.A.*,
  113 F.4th 1249 (9th Cir. 2024) ................................................................................................2

*Brazil v. Dole Packaged Foods, LLC*,
  2014 WL 2466559 (N.D. Cal. May 30, 2014) ..........................................................................5

*Bruton v. Gerber Prods. Co.*,
  2018 WL 1009257 (N.D. Cal. Feb. 13, 2018) ........................................................................22

*Cepelak v. HP Inc.*,
  2022 WL 16824309 (N.D. Cal. Oct. 20, 2022)........................................................................1

*Chow v. Neutrogena Corp.*,
  2013 WL 5629777 (C.D. Cal. Jan. 22, 2013) ........................................................................19

*Cimoli v. Alacer Corp.*,
  587 F. Supp. 3d 978 (N.D. Cal. 2022) .....................................................................................5

*City of Port Arthur v. Daimler Buses N. Carolina, Inc.*,
  2018 WL 3596863 (E.D. Tex. July 12, 2018) .........................................................................7

*In re Clorox Consumer Litig.*,
  301 F.R.D. 436 (N.D. Cal. 2014)............................................................................................11

*Cohen v. DIRECTV, Inc.*,
  178 Cal. App. 4th 966 (2009) .................................................................................................11

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)........................................................................................................10, 20, 23

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014)............................................................................................21

DEFENDANT JPMS'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Conde v. Sensa,*
2018 WL 4297056 (S.D. Cal. Sept. 10, 2018) ....................................................................6, 7

*Conde v. Sensa,*
2019 WL 4277414 (S.D. Cal. Sept. 10, 2019) ........................................................................13

*Darisse v. Nest Labs, Inc.,*
2016 WL 4385849 (N.D. Cal. Aug. 15, 2016) ...............................................................5, 6, 7

*dotStrategy, Co. v. Facebook, Inc.,*
2021 WL 2550391 (N.D. Cal. June 22, 2021) ........................................................................11

*Ehret v. Uber Techs., Inc.,*
148 F. Supp. 3d 884 (N.D. Cal. 2015) ...................................................................................10

*Fagan v. Neutrogena Corp.,*
2017 WL 11418358 (C.D. Cal. Oct. 24, 2017) ...............................................................15, 22

*Gitson v. Trader Joe's Co.,*
63 F. Supp. 3d 1114 (N.D. Cal. 2014) .....................................................................................7

*Gustafson v. BAC Home Loans Servicing, LP,*
294 F.R.D. 529 (C.D. Cal. 2013) ..............................................................................................5

*Hadley v. Kellogg Sales Co.,*
324 F. Supp. 3d 1084 (N.D. Cal. 2018) .................................................................................17

*Hampton v. Gen. Motors LLC,*
2024 WL 2180102 (E.D. Okla. May 13, 2024) .......................................................................7

*In re Hitachi TV Optical Block Cases,*
2011 WL 9403 (S.D. Cal. Jan. 3, 2011) ...................................................................................6

*Jones v. ConAgra Foods, Inc.,*
2014 WL 2702726 (N.D. Cal. June 13, 2014) .......................................................4, 13, 16, 19

*Kaur v. Things Remembered, Inc.,*
2016 WL 11811049 (N.D. Cal. Apr. 20, 2016) .....................................................................24

*Lytle v. Nutramax Lab'ys, Inc.,*
114 F.4th 1011 (9th Cir. 2024) ...........................................................................................8, 21

*Mazza v. Am. Honda Motor Co.,*
666 F.3d 581, 590 (9th Cir. 2012) ...................................................................................5, 6, 11

*McGinity v. Procter & Gamble Co.,*
69 F.4th 1093 (9th Cir. 2023) .................................................................................................17

*McMorrow v. Mondelez Int'l, Inc.*,
  2020 WL 1157191 (S.D. Cal. Mar. 9, 2020) ...................................................................20, 21

*Opperman v. Kong Techs., Inc.*,
  2017 WL 3149295 (N.D. Cal. July 25, 2017) ...................................................................4, 8, 9

*Reitman v. Champion Petfoods USA, Inc.*,
  2019 WL 7169792 (C.D. Cal. Oct. 30, 2019) .........................................................................20

*Shin v. Sanyo Foods Corp. of Am.*,
  2025 WL 366116 (C.D. Cal. Jan. 29, 2025) .............................................................................9

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) .............................................................................10, 12, 18

*Stewart v. Electrolux Home Prod., Inc.*,
  2018 WL 1784273 (E.D. Cal. Apr. 13, 2018) ..........................................................................8

*Stockinger v. Toyota Motor Sales, U.S.A., Inc.*,
  2020 WL 1289549 (C.D. Cal. Mar. 3, 2020) ..........................................................................23

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009) ............................................................................................................9

*Todd v. Tempur-Sealy Int'l, Inc.*,
  2016 WL 5746364 (N.D. Cal. Sept. 30, 2016) ................................................................10, 11

*Townsend v. Monster Beverage Corp.*,
  303 F. Supp. 3d 1010 (C.D. Cal. 2018) ........................................................................9, 18, 20

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016).................................................................................................................4

*In re Vioxx Class Cases*,
  180 Cal. App. 4th 116 (2010) ................................................................................................18

*Vizcarra v. Unilever United States, Inc.*,
  339 F.R.D. 530 (N.D. Cal. 2021).................................................................................9, 20, 21

*Wallenstein v. Mondelez Int'l, Inc.*,
  2024 WL 4293904 (N.D. Cal. Sept. 25, 2024) .........................................................................1

*Williams v. Gerber Prods. Co.*,
  552 F.3d 934 (9th Cir. 2008) .................................................................................................17

*Zakaria v. Gerber Prods. Co.*,
  2016 WL 6662723 (C.D. Cal. Mar. 23, 2016) .......................................................................17

*Zinser v. Accufix Rsch. Inst., Inc.*,
    253 F.3d 1180 (9th Cir.) ................................................................................................6, 23

**Statutes**

Cal. Civ. Code § 1834.9.5 ............................................................................................16

Cal. Civ. Code § 1834.9 ..............................................................................................15

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................................ *passim*

## I.    <u>INTRODUCTION</u>

Plaintiffs' Motion is a smear campaign masquerading as a motion for class certification. Instead of grappling with the analysis Rule 23 requires, Plaintiffs spend the bulk of their pages presenting a grossly inaccurate and unsupported version of the facts, pretending as though they have the type of evidence they promised the Court they would develop (but did not).  But, at this stage, the Court should not assume the truth of Plaintiffs' allegations.  Rather, the Court can (and should) review Plaintiffs' supposed "evidence" of JPMS's "lies" to its customers; that review will reveal Plaintiffs' narrative is pure fabrication.

As to the issue before the Court—that of certification—this is not a case involving a uniform, unambiguous, front-of-the-label statement displayed for years in a manner that was inescapable to the consumer's eye, like "100% Whole Grain" on the front of a Wheat Thins box.[1]  Here, JPMS used multiple different representations throughout the Class Period, and Plaintiffs present no evidence all class members even saw any of the representations at issue. Further, while Plaintiffs make sweeping generalizations as to the representations, calling them "nearly identical," there are key differences in both the literal meanings ("A Pioneer in Cruelty-Free Hair Care" vs. "No Animal Testing"), and consumers' understandings of those statements. Finally, Plaintiffs made no effort to identify the class-wide evidence that would tend to show these statements matter to all (or even most) class members.  Given the "dizzying array" of facts,[2] the key questions have no classwide ***answers*** apt to drive resolution of the litigation.

As one simple example, if one class member believes "Cruelty-Free" means no products are sold in a country requiring animal testing, and another believes it means (as California law defines "cruelty-free") a product is not tested on animals *except* in countries that require it, the same act—selling products in China—would be deceit to the former but not the latter.  Similar

---

[1]    *See Wallenstein v. Mondelez Int'l, Inc.*, 2024 WL 4293904, at *1 (N.D. Cal. Sept. 25, 2024) (Chhabria, J.).

[2]    *Cepelak v. HP Inc.*, 2022 WL 16824309, at *1 (N.D. Cal. Oct. 20, 2022) (Chhabria, J.).

examples abound.  Ultimately, where, as here, individualized inquiries into exposure, materiality, and reliance exist, Rule 23 forbids certification.

The motivation behind Plaintiffs' approach is clear: They hope the Court will simply give them a free pass on certification because they painted JPMS as a "bad actor" (which it is not). But, to do that, the Court would have to ignore Supreme Court and Ninth Circuit precedent, which makes clear class certification requires a "rigorous analysis" because "[c]lass certification is . . . not to be granted lightly."  *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1257–58 (9th Cir. 2024).  JPMS respectfully requests the Court engage in that rigorous analysis and deny Plaintiffs' motion.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs' Premature and Inaccurate Merits Inquiry.

Plaintiffs' continued pattern of mischaracterizing the record compels JPMS to correct key misrepresentations in their Motion.  Space does not permit all to be addressed, but the examples below show their recitation of the facts needs to be validated instead of accepted as true.

#### 1.    *Misrepresentations regarding JPMS's pre-2011 activity in China.*

Plaintiffs claim Luke Jacobellis, retired President of JPMS, admitted JPMS products were animal tested in China prior to 2011.  Mot. 5.  But, as set forth in JPMS's concurrently-filed Opposition to Plaintiffs' Motion for Leave to Amend ("Opp. to Motion for Leave"), Mr. Jacobellis said no such thing.

Plaintiffs also fabricate that JPMS's "agent confirmed that it had performed animal testing to register products in China."  Mot. 4.  The email in question states only that, in October 2011, JPMS's distributor spoke with a registration agent, who "confirmed that the Chinese government requires animal testing."  ECF No. 121-3, Ex. 37 at JPMS-00006993.  Upon learning of this requirement, JPMS exited the Chinese market.  *See* ECF No. 28 ("FAC") ¶ 159.

### 2. *Misrepresentations regarding JPMS's exemption to the animal testing requirement in China.*

Plaintiffs repeatedly state JPMS allowed comparative testing (between animal and non-animal tests) to be performed on its products. *See* Mot. 5–6. The record says otherwise. Between 2015–2021, JPMS worked with JPMS Beijing, MatTek Corporation, and the Beijing Institute for Drug Control ("BIDC") to obtain Chinese product registrations using alternative, non-animal testing methods. *See* ECF No. 121-3, Ex. 24 at 16, 19–20. To validate these methods, the BIDC agreed to use ***MatTek's methods—not*** comparative animal testing—to test ***non-JPMS*** products already available on the Chinese market and compare the results with those of JPMS's products. *See* Declaration of Megan O' Neill ("O'Neill Decl.") Ex. A, at JPMS-00000891; *id.,* Ex. B ("DuVal Dep."), at 216:13–18; *id.,* Ex. C ("MatTek Dep."), at 33:8–17 ("Q: What was your understanding? A: That [JPMS] would not [tolerate] test[ing] on animals even for comparative testing."). Plaintiffs also cite a document entitled "Budget for Alternative Toxicological Test" to claim the BIDC "tested [JPMS] products on both animals and MatTek tissue to compare the results." Mot. 6 (citing to ECF No. 121-4, Exs. 53–54). But there is no evidence this early budget was ever approved. In fact, there is evidence to the contrary. *See, e.g.,* O'Neill Decl. Ex. D, at JPMS-00000884–90.

As another example, Plaintiffs distort the record by selectively quoting an August 2017 email from Mr. Jacobellis to Randy Xu, CEO of JPMS Beijing, to falsely imply that "JPMS internally suspected or knew that its products were being tested on animals." Mot. 8. When read in full, however, the email actually shows Mr. Jacobellis believed—***and wanted to publicly announce***—that JPMS had obtained an exemption from the animal testing requirement in China, and he urged Mr. Xu to obtain the Chinese government's approval to make that statement. ECF No. 121-5, Ex. 68 at JPMS-00002715.[3]

---

[3]  *See also id.,* Ex. E ("Jacobellis Dep.") at 220:20–25 ("Q. Okay. Going back, once Randy communicated to you that JPMS had been approved not to do animal tests in China did you ask Randy if JPMS could make a public announcement? A. Yes. We wanted to go forward with that information.").

Lastly, Plaintiffs rely on an attorney's back-of-the-napkin calculations to argue JPMS did not purchase enough MatTek tissues for its product registrations in China. Mot. 7–8 (citing ECF No. 121-6). But they are not experts in Chinese law. Plaintiffs have no support for their assumptions that the same testing was required for every product and disregard the actual Chinese regulations attached to their complaint, which contemplate flexibility in testing requirements, including reduced toxicological testing where ingredients share similar chemical structures or properties with those already used in cosmetics.[4]

## III.    PLAINTIFFS FAIL TO SATISFY THE REQUIREMENTS OF RULE 23(B)(3)

Rule 23(b)(3)'s "stringent" predominance requirement "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *14 (N.D. Cal. June 13, 2014). "In determining whether common questions predominate, the Court identifies the substantive issues related to the plaintiff's claims (both the causes of action and affirmative defenses) and then considers the proof necessary to establish each element of the claim or defense, and how these issues would be tried." *Opperman v. Kong Techs., Inc.,* 2017 WL 3149295, at *6 (N.D. Cal. July 25, 2017). As Plaintiffs recognize, the predominance analysis requires proving ***each element*** "is susceptible to generalized, class-wide proof." Mot. 17 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Here, Plaintiffs fail to prove that certifying a nationwide class, demonstrating exposure, reliance and materiality, and calculating damages are indeed susceptible to class-wide proof. Nor do they prove a class action is the superior method for adjudicating this case.

---

[4]    *See* ECF No. 28-2 at 134 ("New raw materials for cosmetic products, generally requiring the following toxicological tests. . . . If the new ingredient has a similar chemical structure and properties to those already used in cosmetics, some tests may be considered for reduction."); ECF No. 28-3 at 10 ("If the chemical structure and characteristics of the new raw material are similar to those of the raw material used in cosmetics, some tests may be considered to be reduced. . . . The toxicology test in this regulation is a principle requirement, and the test items can be increased or reduced according to the physical and chemical characteristics of the raw material, quantitative structure-activity relationship, toxicology data, clinical research, population epidemiological investigation and toxicity of similar compounds.").

**A.      Plaintiffs May Not Assert Claims on Behalf of a Nationwide Class.**

Plaintiffs seek to certify a nationwide class for all their claims.  This would be contrary to law.  As the Ninth Circuit instructed in *Mazza v. Am. Honda Motor Co*., to determine whether a nationwide class can be certified under California law, as opposed to each state's laws governing the claims of its own citizens, the Court must apply California's "governmental interest" choice-of-law test.  666 F.3d 581, 590 (9th Cir. 2012).  This test looks to: (1) " whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different"; (2) "each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists"; and (3) "the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state."  *Id*.  It then "applies the law of the state whose interest would be more impaired if its law were not applied."  *Id*.

Plaintiffs' theory that a nationwide class is appropriate because the allegedly "wrongful acts emanated from California," Mot. 15, directly conflicts with *Mazza* and is based on "outdated California cases before *Mazza* that unlikely survived *Mazza*'s holding."  *Cimoli v. Alacer Corp*., 587 F. Supp. 3d 978, 995 (N.D. Cal. 2022) (holding the place of the wrong is wherever "the last event necessary to make the actor liable occurred . . . not the state where the intention to misrepresent was formed or where the misrepresented acts took place").

>        1.      *Courts in the Ninth Circuit consistently hold California consumer*
>                *protection claims may not be asserted on behalf of a nationwide class.*

Courts in this Circuit have consistently and repeatedly determined state consumer protection law variations bar certification of a nationwide class under California law.  *See, e.g., Darisse v. Nest Labs, Inc*., 2016 WL 4385849, at *8–10 (N.D. Cal. Aug. 15, 2016); *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *13–14 (N.D. Cal. May 30, 2014); *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 537–40 (C.D. Cal. 2013).  Because the laws of each state must govern proposed class members' claims, individual issues "compound[]

exponentially," precluding certification. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1188 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001); *see also Mazza*, 666 F.3d at 596. So too here. Indeed, Plaintiffs implicitly concede only a California class is potentially certifiable. Mot. 15 n.10.

> 2.    *Due to conflicts of laws amongst the 50 states, Plaintiffs may not assert a breach of express warranty claim on behalf of a nationwide class either.*

As with Plaintiffs' consumer protection claims, applying the governmental interest test to Plaintiffs' express warranty claim leads to the same conclusion: The application of 50 states' laws would be required, meaning "common questions of law do not predominate over the questions affecting individual class members as required by Rule 23(b)(3)." *Darisse*, 2016 WL 4385849, at *15.

Numerous courts in this District and this Circuit have found there are material conflicts between the laws of California and the other 49 states with respect to whether or not reliance is required. *See, e.g., id.* at *11 (determining "[e]xpress warranty law also varies across the 50 states" due to material differences in, *inter alia*, states' treatment of the elements of reliance and pre-suit notice); *Conde v. Sensa*, 2018 WL 4297056, at *12–13 (S.D. Cal. Sept. 10, 2018) (finding defendants demonstrated variation on "material issues" including reliance and notice requirements); *In re Hitachi TV Optical Block Cases*, 2011 WL 9403, at *6 (S.D. Cal. Jan. 3, 2011) ("[T]here are material conflicts between California warranty law and the warranty law of the other forty-nine states."); *see also* O'Neill Decl. Ex. F (Variations in Reliance and Privity in Breach of Express Warranty Claims Across Jurisdictions).

That "all 50 states have an interest in having their own laws applied to the consumer transactions that took place within their borders" is well-established. *Darisse*, 2016 WL 4385849, at *14. For that reason, courts have consistently held "California recognizes that with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest." *Mazza*, 666 F.3d at 593 (cleaned up). Conversely, while California has a strong interest in regulating conduct within its own borders, its "interest in applying its law to

residents of foreign states is attenuated." *Id.* at 594. Under California law, the "place of the wrong" is the "geographic location . . . where the misrepresentations were communicated to the consumer." *Darisse*, 2016 WL 4385849, at *15.

Here, the home states of non-California residents have the predominant interest in regulating any alleged breaches of warranty that may have happened within their borders— especially as compared to California's attenuated interest in applying its laws extraterritorially. *Conde*, 2018 WL 4297056, at *14 (declining to certify nationwide class for breach of warranty claims "[f]or purchases made outside California" because "other states' interests would be more impaired by applying California law than would California's interests by applying the laws of other states"). Because the Court would have to apply the laws of 50 states, common questions of law do not predominate for the nationwide class, as is required by Rule 23(b)(3). *Id.*

> 3. *Plaintiffs may not assert their breach of express warranty claim under the state laws of Texas, Virginia, or Oklahoma.*

For the reasons argued in JPMS's concurrently-filed Opp. to Motion for Leave, Plaintiffs should not have the opportunity to add additional claims or plaintiffs at this late stage. *See* Mot. 14 & n.9. Because Plaintiffs did not plead express warranty claims under the laws of Texas, Virginia, and/or Oklahoma in the operative FAC, JPMS does not address subclasses for consumers of those states here.[5] To the extent Plaintiffs argue on reply that a multi-state class or warranty subclasses for these states should be certified, JPMS reserves the right to explain why they may not.[6]

---

[5] Nor have Plaintiffs "demonstrate[ed] a suitable and realistic plan" for certification of subclasses including class members from any other state. *Gitson v. Trader Joe's Co*., 63 F. Supp. 3d 1114, 1116 (N.D. Cal. 2014) (Chhabria, J.) (cleaned up); *see also* O'Neill Decl. Ex. F (survey of differences between the fifty states' and D.C.'s breach of warranty laws).

[6] For example, Oklahoma and Texas require a showing of actual reliance, a material difference from the "presumption of reliance that can be overcome" in California. *Darisse*, 2016 WL 4385849, at *11; *see also Hampton v. Gen. Motors LLC*, 2024 WL 2180102, at *12–13 (E.D. Okla. May 13, 2024), *report and recommendation adopted*, 2024 WL 4307185 (E.D. Okla. Sept. 26, 2024); *City of Port Arthur v. Daimler Buses N. Carolina, Inc.*, 2018 WL 3596863, at *5 (E.D. Tex. July 12, 2018), *report and recommendation adopted*, 2018 WL 3594304.

## B.    Individualized Issues Predominate as to Exposure to, Reliance on, and Materiality of the Challenged Statements.

As an initial matter, while Plaintiffs treat the varied statements JPMS made throughout the class period[7] (the "Challenged Statements") as a single, uniform representation, they are not. Instead, the Challenged Statements consist of (a) marketing and advertising language appearing across various media (the "Marketing Statements")[8] and (b) claims made specifically on product packaging (the "Label Claims").[9]

**CLRA Claim:**  Plaintiffs acknowledge they must show a misrepresentation, reliance, and harm to satisfy the CLRA.  Mot. 18.  Although Plaintiffs discuss, as they must, the materiality requirement necessary for a presumption of reliance, *see* Mot. 19 (recognizing presumption of reliance depends on "demonstrating a *material* misrepresentation was made to the *entire class*" (emphasis added) (citing *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1022 (9th Cir. 2024), *cert. denied*, 2025 WL 663695 (U.S. Mar. 3, 2025))), Plaintiffs gloss over two key prerequisites for such a presumption: (1) ***exposure*** to (2) ***uniform*** misrepresentations.  *See Stewart v. Electrolux Home Prod., Inc.*, 2018 WL 1784273, at *5 (E.D. Cal. Apr. 13, 2018) (explaining that to establish actual reliance, plaintiffs must show, *inter alia*, they were "exposed to (*e.g.*, heard, read, or saw) a defendant's representation regarding a product"); *Opperman,* 2017 WL 3149295, at *6 (holding class-wide inference of reliance available ***only*** where (1) "uniform misrepresentations were made to the class, and (2) that those misrepresentations were material").

**UCL and FAL Claims:**  "For purposes of class certification, the UCL, FAL, and CLRA

---

[7]    "Class period" refers to the class period defined in the operative FAC, not the class period proposed in Plaintiffs' motion for leave to file a further amended complaint (ECF No. 125-1).

[8]    The Marketing Statements include statements such as "No Animal Testing. Never Have. Never Will," "Cruelty-Free Since 1980," and "Paul Mitchell is always looking out for our furry friends."  *See* Mot. 2; FAC ¶¶ 51, 54, 57, 63–64.

[9]    The Label Claims are: "A Pioneer in Cruelty-Free Hair Care"; "No Animal Testing"; and "John Paul Mitchell Systems does not conduct or endorse animal testing."  *See* Mot. 1–2; FAC ¶ 73.

are materially indistinguishable." *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1043–44 (C.D. Cal. 2018). Plaintiffs must show the Challenged Statements were (1) material and (2) likely to deceive." *Id.* at 1044; *see also In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) ("[A] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material."); *Vizcarra v. Unilever United States, Inc.*, 339 F.R.D. 530, 552 (N.D. Cal. 2021) (explaining "the two questions central to a claim under the UCL and FAL" are "likelihood of deception and materiality," which must be shown to be "susceptible to resolution with common proof"). UCL and FAL claims (like the CLRA) require exposure to uniform misrepresentations. *Opperman,* 2017 WL 3149295, at *6.

**<u>Breach of Express Warranty Claim</u>:** "To prevail on a breach of express warranty claim under California law, a plaintiff must prove that: (1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *Shin v. Sanyo Foods Corp. of Am.*, 2025 WL 366116, at *7 (C.D. Cal. Jan. 29, 2025) (cleaned up). As with the CLRA, UCL and FAL claims, Plaintiffs must further make a sufficient showing that the Challenged Statements were "materially misleading." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013); *see also Shin*, 2025 WL 366116, at *7 (citing cases).

Accordingly, for each cause of action, Plaintiffs must show they can establish ***by common proof*** that JPMS's alleged misrepresentations caused harm to the proposed class because they were material and, therefore, relied upon. But because heterogeneity is an impediment to certification, Plaintiffs ignore critical variations among the statements. Rule 23 does not permit the Court to do the same.

Upon examining Plaintiffs' claims closely, it is clear they cannot meet their predominance burden for several reasons. *First*, Plaintiffs have not established class-wide exposure to the Marketing Statements. *Second,* as to the Label Claims, Plaintiffs fail to show uniform exposure to identical claims. *Third*, Plaintiffs have not demonstrated proposed class members share the same (or even a similar) understanding of any single Label Claim (instead

ignoring the many different interpretations of those claims class members hold). *Finally*, Plaintiffs have no common evidence establishing the Label Claims were material to a significant number of class members—whereas JPMS has clear evidence they were ***not***.

> 1. *Because there was no class-wide exposure to the Marketing Statements, there can be no presumption of materiality or reliance thereon.*

For each Challenged Statement, Plaintiffs must first "prove that the class members were *exposed* to [that] alleged misrepresentation[]." *Todd v. Tempur-Sealy Int'l, Inc.*, 2016 WL 5746364, at *8 (N.D. Cal. Sept. 30, 2016) ("[I]t means little if an objective, reasonable consumer would have found the alleged misrepresentations material if none of the class members saw, read, or were otherwise exposed to those misrepresentations."); *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) ("We do not, of course, suggest that predominance would be shown in every California UCL case. For example, it might well be that there was no cohesion among the members because they were exposed to quite disparate information from various representatives of the defendant."), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Plaintiffs cannot do so here with respect to the Marketing Statements.

Because Plaintiffs conflate very different statements into a single "promise" by JPMS, *see, e.g.,* Mot. 22 ("Plaintiffs have alleged specific representation [sic] made to every Class member . . . in its advertising."),[10] they do not even attempt to establish Plaintiffs themselves, let alone proposed class members, actually saw those statements. *See Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 900 (N.D. Cal. 2015) ("The burden [is] on Plaintiff to prove sufficient exposure."). While courts often infer class-wide exposure to claims uniformly and prominently appearing on product packaging,[11] *see, e.g., id.* at 895, the same is not true for statements made

---

[10]  *See also* Plaintiffs' Trial Plan (ECF No. 121-5, Ex. 79, at 238) (referring to "affirmations of fact about its products being 'cruelty-free' and never tested on animals"); Plaintiffs' Proposed Verdict Form (ECF No. 121-10) (same).

[11]  JPMS disputes that inference is available here. *See infra* Section III.B.2.

across different advertising channels absent proof of a sufficiently "'extensive' and 'longstanding' marketing campaign[]." *Todd*, 2016 WL 5746364, at *11 (finding statements made in direct mailings, website pages, and customer service communications fell "far short" of this standard as necessary "to justify class certification") (citation omitted); *see also In re Clorox Consumer Litig.*, 301 F.R.D. 436, 439, 444 (N.D. Cal. 2014) (declining to certify class in connection with statements made only in limited advertising campaign and on select product labels); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 969, 979 (2009) (upholding denial of class certification where proposed class included consumers who never saw the relevant print advertising and promotional materials prior to purchase).

Nor can Plaintiffs claim, in their reply, that the Marketing Statements *were* part of a sufficiently "extensive and long-term" advertising campaign to "justify a presumption of classwide exposure." *dotStrategy, Co. v. Facebook, Inc.*, 2021 WL 2550391, at *4 (N.D. Cal. June 22, 2021) (citing *Mazza*, 666 F.3d at 596). JPMS has decisive evidence showing proposed class members were ***not*** uniformly exposed to the Marketing Statements. For example, Plaintiffs cite a single Facebook post from a "Social Media Report" covering just ***one month*** of the class period. *See* Mot. 19; ECF No. 121-5, Ex. 75 at JPMS-00127197. The "top Facebook post[]" Plaintiffs reference, which stated that "John Paul Mitchel Systems is, and always will be, cruelty-free," *see* Mot. 19, reached an audience of *under 20,000* and had only a *3.41% engagement rate*. ECF No. 121-5, Ex. 75 at JPMS-00127197. A corresponding Instagram post including the phrase "No Animal Testing[,] Never Have. Never Will." reached just over 26,000 people and received less than 2,000 likes and comments combined. *Id.* at JPMS-00127207. However, this document also evidences the wide variety of JPMS's social media posts. For example, a different Facebook post about founder John Paul DeJoria's business philosophy (containing no Challenged Statements) had over twice the amount of reach and comments as the one Plaintiffs point to. *Id.* at JPMS-00127197.

JPMS's expert, Dr. Hanssens, analyzed social media posts across the ***entire class period***. *That* analysis indicates the Marketing Statements were only featured in 2–6.66 percent of all

posts. O'Neill Decl. Ex. G ("Hanssens Report"), ¶¶ 50–53. Moreover, cruelty-free messaging was only one of several advertising themes promoted in JPMS's marketing. *Id.* ¶¶ 44–47. Plaintiffs therefore have not, and cannot, put forth evidence that would permit an inference of class-wide exposure as to the Marketing Statements.

 2. *Proposed class members were not uniformly exposed to the Label Claims, do not share a uniform understanding of them, and do not consistently consider them to be material, meaning individualized issues predominate.*

Even as to the Label Claims, Plaintiffs have failed to show sufficient "cohesion" among potential class members to establish predominance. *Stearns*, 655 F.3d at 1020. Plaintiffs have not even clearly defined *what actions* by JPMS rendered *which statements* misleading to consumers or constituted a breach of *which* "express warranties." *See generally* Mot. The evidence necessary to answer these questions differs greatly depending which label a given consumer relied on (e.g., "A Pioneer in Cruelty-Free Hair Care" or "No Animal Testing"), what that consumer understood the label to promise (e.g., lobbying against animal testing versus the company not performing animal testing versus no animals dying as part of testing, etc.), and what actions by JPMS would render that label "misleading" in that consumer's eyes. *See* Appendix A (Possible Interpretations of Label Claims). Because Plaintiffs simply pretend these permutations do not exist, calling the Label Claims "nearly identical," Mot. 12–13, they have fallen far short of satisfying Rule 23.

 (a) Different Label Claims were on JPMS products in the marketplace at the same time, making it impossible to know who saw what and when they saw it.

Critically, each Label Claim was used on product packaging during a different window of time: "[JPMS] does not conduct or endorse animal testing" was used for only approximately one year of the class period, the bunny symbol stating "No Animal Testing" was used from 2014 until January 2020, and the dove symbol stating "A Pioneer in Cruelty-Free Hair Care" has been used since then. ECF No. 120-1 ¶¶ 7–9. Further, these statements appeared on labels for several brands and *hundreds of products*, so each label change—which went into effect on a rolling basis

as existing stock was sold off to consumers—caused numerous products with different labels to be available for purchase at the same time across the various channels where JPMS products are sold. Declaration of Jason Yates ("Yates Decl.") ¶¶ 8, 12–13.

Thus, it impossible to know which Label Claim any consumer may have seen simply by determining when the product was purchased. *Id.* ¶ 14. Plaintiffs cannot show predominance as to the Label Claims for this reason alone. *Conde v. Sensa*, 2019 WL 4277414, at *8 (S.D. Cal. Sept. 10, 2019) (finding common questions did not "outweigh individual issues regarding reliance" where "different alleged misrepresentations were made to different groups of consumers during the proposed class period"); *Jones*, 2014 WL 2702726, at *17 (finding "lack of cohesion" sufficient to defeat predominance where label statements "varied by can size, variety, and time period" and "consumers were exposed to label statements that changed over time and from product to product").

> (b)    Proposed class members' understanding of the Label Claims varies
>         wildly, such that individual issues predominate as to meaning.

Even if Plaintiffs were to seek distinct subclasses for the three Label Claims,[12] and even if it were feasible to do so (it is not, for the reasons set forth above), abundant evidence shows class members do not share a uniform understanding of each Label Claim. This is unsurprising given the Label Claims are not interchangeable; each carries a distinct meaning and may be interpreted differently by consumers. For example, "A Pioneer in Cruelty-Free Hair Care" may connote JPMS's leadership in the cruelty-free cosmetics industry, while "No Animal Testing" may be understood to refer to a single product or its ingredients.[13] *See, e.g.,* O'Neill Decl. Ex. H

---

[12]    For clarity, Plaintiffs have *not* proposed subclasses corresponding to the different Label Claims in their Motion.

[13]    The definitions put forward by Mr. Jacobellis, relied on by Plaintiffs, are irrelevant to this analysis. *See* Mot. 2–3. His individual understanding of "cruelty-free," "no animal testing," and "pioneer in cruelty-free" does not speak to *all consumers'* interpretations of these terms—or consumers' associated expectations as part of the "benefit of the bargain." *See In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, 2017 WL 2559615, at *7 (C.D. Cal. June 7, 2017) (rejecting deposition testimony about one individual's understanding of the claim at

("Gonnella Dep."), at 82:13–83:1 ("Q. What does the phrase 'A pioneer in cruelty-free' mean to you? A. Well, to me it means they were the first ones to become cruelty-free, a pioneer. Q. And what does 'no animal testing' mean to you? A. That means that every single ingredient listed on this bottle separately has ever been tested on an animal.").

Plaintiffs' testimony is illustrative. In their complaint, Plaintiffs define "cruelty-free"[14] as indicating "products and the ingredients in those products are not tested on animals anywhere in the development, testing, manufacturing, or production of a product." FAC ¶ 43. Yet in their depositions, Plaintiffs offered alternative definitions of the term, including: "treating animal[s] or people with kindness and respect" (O'Neill Decl. Ex. I ("Rule Dep."), at 151:7–152:5); specifically refraining from "stick[ing] stuff in [animals'] eyes" or otherwise using animals as a "scientific study" (*id.*, Ex. J ("Heagney Dep."), at 40:18–25); or indicating "less chemical[s]" or "filler ingredients" (*id.*, Ex. K ("Guerrero Dep."), at 47:23–48:1). Gonnella also testified that calling a product that had been tested on animals twenty years prior "cruelty-free" would "not really [be] a misstatement." Gonnella Dep. 88:3–12; s*ee also id.* at 86:16–21 ("It's cruelty-free. I'm – what exactly is cruelty-free? I'm realizing things mean different things to different people. So I'm not – I just don't know."). Plaintiffs' own expert, too, noted "significant misunderstandings about what the cruelty-free product labels and claims mean." ECF No. 123-5 ("Macartney Report"), ¶ 23.

At bottom, this is not a false advertising case involving an unambiguous representation like "Contains No Artificial Flavors." Rather, consumers will have different understandings of whether each Label Claim applies to (a) animal testing of final products or ingredients; (b) testing within the United States only, or testing globally; (c) testing on living or dead animals,

---

issue as basis for establishing materiality was subject to common proof because it "address[ed] only how [defendant] perceived its own branding techniques, and not how consumers reacted to the product name or the alleged misstatements on the 5HE label").

[14] Because Plaintiffs focus on the meaning of "cruelty-free" in their Motion, JPMS will also address the meaning of "cruelty-free" within "A Pioneer in Cruelty-Free Hair Care."

or (d) testing that causes minimal harm versus testing that leads to death. *See* Appendix A. In fact, some consumers might understand some of the Label Claims to designate a company that complies with California Civil Code section 1834.9, which bans "traditional animal test methods" but excepts the use of such methods "to comply with requirements of state or federal agencies" or "for the purpose of medical research." Cal. Civ. Code § 1834.9(a), (c), (e); *see also* O'Neill Decl. Ex. L, at EXPERT-MACARTNEY-001198–001199 (study cited by Plaintiffs' expert limiting definition of animal testing to testing "not required by law"). In total, there are at least 142 reasonable interpretations of the Label Claims. Appendix A. Thus, the Label Claims are not—as Plaintiffs claim—"nearly identical," Mot. 12, and whether consumers considered them material is an "individualized inquiry." *Fagan v. Neutrogena Corp.,* 2017 WL 11418358, at *2 (C.D. Cal. Oct. 24, 2017) (finding challenged statements were not "identical" and "evidence demonstrate[d] that consumers interpret[ed] these different claims to communicate different messages") (cleaned up).

Even consumers exposed to the ***same*** Label Claim may have a different understanding of what its message means. Hanssens conducted the Purchase Factors and Interpretations Survey of buyers and potential buyers of at-issue products, in which he asked respondents about their interpretation of the "No Animal Testing" logo or the "Pioneer in Cruelty-Free Hair Care" logo. Hanssens Report ¶¶ 55–59. He concluded "consumers do not have a common understanding or interpretation of the allegedly misleading logos." *Id.* ¶ 16. For example, when asked what would be acceptable in connection with the testing of a product bearing the "No Animal Testing" logo, 59 percent of respondents said testing on the skin, eyes, or other tissue samples obtained from ***dead*** animals that died from causes unrelated to testing was acceptable. *Id.* ¶ 57. Interestingly, though, 30 percent of respondents deemed testing on skin, eyes, or other tissues of ***living*** animals ***also*** acceptable. *Id.* Therefore, even were a consumer to understand "No Animal Testing" as referring only to the final product, it's plausible different consumers could have

different tolerances for when, where, and why animal testing could occur without considering the claim to be a misrepresentation.[15]

As a further example, a consumer could assume that "No Animal Testing" means no animal testing *in the United States* or no animal testing *unless required by law*. Hanssens also performed the Purchase Intention Survey to study the effect of a disclaimer added to the "No Animal Testing" logo that said, "No animal testing except in countries where it is required by law. No animal testing in the U.S." *Id.* ¶¶ 60–64. He found no statistically significant difference in respondents' likelihood to purchase the product bearing the disclaimer, as compared to the standard logo, *id.* ¶ 63, suggesting that this is, in fact, a reasonable interpretation. Moreover, California's own Cruelty-Free Cosmetics Act includes an exception for "[a]n animal test that was conducted to comply with a requirement of a foreign regulatory authority, if no evidence derived from the test was relied upon to substantiate the safety of the cosmetic sold in California by the manufacturer." Cal. Civ. Code § 1834.9.5(c)(2).

"Where plaintiffs fail to establish a controlling definition for a key term in an alleged misstatement, courts have found that materiality is not susceptible to common proof." *In re 5-Hour Energy*, 2017 WL 2559615, at *8) (citing cases); *see also Astiana*, 291 F.R.D. at 508 (finding inadequate showing of materiality where plaintiffs failed "to sufficiently show that 'All Natural' ha[d] any kind of uniform definition among class members"); *Jones,* 2014 WL 2702726, at *14 (finding lack of predominance where "labels changed over time" and "even if the challenged statements were *facially* uniform, consumers' *understanding* of those representations would not be").

---

[15] Likewise, "cruelty-free" can be subject to multiple meanings. In a study cited by Macartney, survey respondents provided varying definitions of cruelty-free, including: "did not do animal testing on a product"; "did not harm animal with testing"; and "animal raised humanely." ECF No. 120-12 at EXPERT-MACARTNEY-001583; *see also* O'Neill Decl. Ex. M ("Ugone Report") ¶¶ 66–69 (concluding, after review of Plaintiffs' deposition testimony and Macartney's cited literature, "there is no uniform definition" for the term "cruelty-free").

(c)    <u>Class-wide reliance should not be presumed here given the Label Claims were not prominently featured.</u>

An inference of class-wide exposure to the Label Claims is further inappropriate because of their size and placement on product labels. The label stating JPMS "does not conduct or endorse animal testing" appeared vertically along the side of bottles in small font. ECF No. 120-1 ¶ 7. Likewise, the bunny symbol with the text "No Animal Testing" and the dove symbol stating "A Pioneer in Cruelty-Free Hair Care" were displayed in small text on the side labels of bottles. *Id.* ¶¶ 8–9; Ugone Report ¶ 61 (Fig. 2). Courts in the Ninth Circuit have found representations displayed in similarly non-prominent fashion to preclude a finding of class-wide exposure. *See, e.g.*, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1099–1100 (N.D. Cal. 2018) (finding "'wholesome goodness' phrase on Nutri-Grain packaging was not sufficiently 'prominently displayed' to warrant an inference of class-wide exposure" where  phrase "only appeared (1) on the back panel of the Nutri-Grain packaging; (2) 'in small font'; and (3) in the middle of a block of text") (citation omitted); *Zakaria v. Gerber Prods. Co.*, 2016 WL 6662723, at *8 (C.D. Cal. Mar. 23, 2016) ("As these labels show, the alleged misrepresentations were not prominently displayed. For this reason, it cannot be inferred that there is a 'high likelihood that in the process of buying the product, the consumer would have seen the misleading statement on the product and thus been exposed to it.'") (citation omitted). In other labeling case contexts, the Ninth Circuit has confirmed that back label statements cannot "cure" misrepresentations made on the front label. *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1098 (9th Cir. 2023) (*citing Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008)). Given the Ninth Circuit has held a reasonable consumer should not be expected to review statements on the back label, an inference of class-wide reliance based on such statements here would be a contradictory result.

(d)    <u>The Label Claims were not material to a large portion of the class.</u>

Plaintiffs make no effort to offer competent evidence the Label Claims are material to all proposed class members. In contrast, JPMS has presented evidence that, to many consumers, the Label Claims were *not* material, precluding a common, class-wide answer to the question of their

materiality. *See Stearns*, 655 F.3d at 1022–23 (holding that where misrepresentations are not material as to all class members, the issue of reliance "varies from consumer to consumer and the class should not be certified") (cleaned up); *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 133 (2010) (finding presumption of reliance appropriate only with showing of "common evidence as to what consumers perceived or what they would find material").

Evidence offered by JPMS highlights numerous other factors influencing purchasers' decisions. Survey results from Hanssens show that respondents ranked factors such as price, scent, quality, and effectiveness significantly higher than "cruelty-free," which appeared near the bottom of the list—34th out of 40. Hanssens Report ¶¶ 37–38. This is consistent with an analysis of 9,724 Amazon.com reviews of JPMS products, where only 28 reviews (0.29 percent) mentioned the words "animal" or "cruelty." *Id.* ¶ 42. JPMS's damages expert, Dr. Keith Ugone, also highlighted variations in Plaintiffs' own exposure to, awareness of, and research about animal testing, which he concluded are likely to be reflected in proposed class members' "willingness to pay for the 'cruelty-free' attribute." Ugone Report ¶¶ 116–118.[16] This evidence indicates "the representations [were] not material to most or even a substantial portion of the class." *In re 5-Hour Energy*, 2017 WL 2559615, at *8 (concluding "[c]ourts have refused to certify a consumer protection class where plaintiffs make such a limited showing of class-wide materiality"); *see also Townsend*, 303 F. Supp. 3d at 1045 (holding challenged statements need not have been "dominant factor in consumers' purchasing decisions," but must have been "*in fact material*" as compared to (or in addition to) factors such as "price, promotions, retail positioning, taste, texture or brand recognition") (emphasis added) (citation omitted).

Rather than refute this evidence, Plaintiffs merely dismiss Hanssens' survey (*see* Mot. 20), while offering ***no survey or empirical evidence of their own*** to show the Label Claims were a substantial factor in the reasonable consumer's purchasing decisions. "Absent a consumer

---

[16] Plaintiffs' expert, Dr. Macartney, made no effort to determine materiality. Macartney Report ¶ 35 (claiming "the specific reason why each customer purchased a cruelty-free product is irrelevant" to his calculation of damages).

survey or other market research to indicate how consumers reacted to the . . . statements, and how they valued these statements compared to other attributes of the product . . . Plaintiffs have not offered sufficient evidence of materiality across the class." *In re 5-Hour Energy*, 2017 WL 2559615, at *8; *see also Chow v. Neutrogena Corp.*, 2013 WL 5629777, at *2 (C.D. Cal. Jan. 22, 2013) (denying class certification given lack of proof to distinguish between consumers who were favorable to the brand name and those who relied on specific advertised benefits).

Instead—perhaps to distract from their Rule 23 shortcomings—Plaintiffs offer blatantly mischaracterized evidence of class-wide materiality: Plaintiffs claim respondents to a JPMS survey "stated that 'no animal testing' and 'animals' [were] the second thing they thought about when they thought about Paul Mitchell or Tea Tree," Mot. 19, but the sources of those statistics are in fact ***unranked, alphabetical*** lists of various word associations with the concept of "***philanthropy***" in the Paul Mitchell and Tea Tree lines.  ECF No. 123-6 at JPMS-00177537.

Given the absence of evidence, the Court need not "look to the hypothetical reasonable consumer . . . [or] infer reliance *given the evidence presented*."  *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 453 (S.D. Cal. 2014) (emphasis added) (finding materiality and reliance were "not subject to common proof" because consumers' purchasing decisions were based on numerous reasons distinct from the allegedly deceptive statements).  Rather, this Court should follow the lead of other courts in the Ninth Circuit which have denied class certification when evidence of materiality is lacking in this way or where plaintiffs have similarly left evidence against a finding of materiality unchallenged.  *See, e.g., Jones*, 2014 WL 2702726, at *15 ("[Plaintiffs' expert] did not explain *how* the challenged statements, together or alone, were a factor in any consumer's purchasing decisions.  She did not survey any customers to assess whether the challenged statements were in fact material to their purchases, as opposed to, or in addition to, price, promotions, retail positioning, taste, texture, or brand recognition.").

Because Plaintiffs' motion depends on materially different statements that varied over time, were displayed differently to proposed class members, and were understood to promise very different things (some of which Plaintiffs do not even accuse JPMS of violating), the Court

should deny certification of all claims given predominance is not satisfied. *See Vizcarra*, 339 F.R.D. at 546–47, 552 (denying certification in absence of evidence indicating common understanding of challenged representations or survey evidence testing reasonable consumer's understanding of representations); *see also Townsend*, 303 F.Supp.3d at 1044 (determining plaintiffs' presentation of "very little evidence regarding the materiality of the statements" at issue was "fatal to Plaintiffs' attempt to demonstrate affirmatively" compliance with Rule 23(b)(3)); *Reitman v. Champion Petfoods USA, Inc.*, 2019 WL 7169792, at *10 (C.D. Cal. Oct. 30, 2019) (finding individualized inquiries predominated for breach of warranty claims even where challenged statements had "common message" where "uniform misrepresentations [were] lacking"), *aff'd*, 830 F. App'x 880 (9th Cir. 2020); *Astiana*, 291 F.R.D. at 509 (holding it was "fatally unclear whether, from the perspective of the putative class, Defendant breached any express warranty" where plaintiffs made "an insufficient showing that the 'All Natural' representation [was] materially misleading").

### C.    Plaintiffs' Damages Models Do Not Match Their Theory of Liability as Required by *Comcast*.

Plaintiffs also bear the burden of "establish[ing] that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35.  In addition, "any model supporting a plaintiff's damages case must be consistent with its liability case." *Id.* (cleaned up).  Class certification should be denied under *Comcast* "when the proposed price premium (*i.e.*, over payment) methodology fails to . . . isolate the premium attributable only to the alleged misleading marketing statement[s]." *McMorrow v. Mondelez Int'l, Inc.*, 2020 WL 1157191, at *8 (S.D. Cal. Mar. 9, 2020) (citations omitted).  Plaintiffs allege they were injured because they "would not have purchased the products or paid as much for them without the [Challenged Statements]." Mot. 21.  But Macartney's proposed damages models do not, and cannot, isolate the premium attributable to only the Challenged Statements as required under *Comcast,* and thus, they do not match Plaintiffs' theory of liability.

1.    *Macartney's proposed conjoint survey does not satisfy* Comcast.

As outlined in JPMS's Motion to Exclude Testimony of Plaintiffs' Expert Gareth J. Macartney, ECF No. 120, the single conjoint survey Macartney proposes is ill-equipped for several reasons.  **First**, Macartney fails to identify which Challenged Statement(s) he will test using his proposed conjoint survey, a necessary prerequisite to isolating any corresponding price premium.  *See id.* at 8–9.  Here, the Challenged Statements are not identical—thus, a damages model consistent with Plaintiffs' theory of liability must measure the price premium, if any, attributable to **each** Challenged Statement, *see Vizcarra*, 339 F.R.D. at 553–54 (denying class certification where expert's proposed conjoint analysis did not measure the price premium for specific representations at issue); *McMorrow*, 2020 WL 1157191, at *5–9 (same),  not merely the premium attributable to an unspecified "cruelty-free attribute," Macartney Report ¶ 35.

**Second**, Macartney fails to develop the mechanics of his proposed conjoint survey, from the attributes to be tested or the level per attribute, to the target population, sampling method, or validation method.  ECF No. 120 at 7–8.  Such failure is untenable under *Comcast*.  *See Lytle*, 114 F.4th at 1032 ("Merely gesturing at a model or describing a general method will not suffice to meet this standard.  Rather, . . . [the expert] must chart out a path to obtain all necessary data and demonstrate that the proposed method will be viable as applied to the facts of a given case."); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) (finding expert failed to provide viable damages model where he failed to "identify any variables he intend[ed] to build into the models" or "identify any data presently in his possession to which the models [could] be applied").

**Third**, Macartney provides no details about how his proposed conjoint survey would—or could—adequately capture a uniform willingness to pay among the diverse array of products at issue here, each having inherently different characteristics.  ECF No. 120 at 9–10; *see also* Ugone Report ¶¶ 37–48 (concluding Macartney's failure to acknowledge differences between brands, target consumers, product-level attributes, packaging, and price among the at-issue products renders his proposed conjoint analysis unreliable).

**Fourth,** because Macartney fails to adequately account for supply-side factors, his proposed conjoint analysis, at best, would measure consumer demand or willingness to pay rather than a class-wide price premium.  *See* ECF No. 120 at 10–11; Ugone Report ¶¶ 94–98. For example, Macartney does not account for how different sales channels affect product pricing. Ugone Report ¶ 78 (noting that different sales channels, such as online platforms and hair salons, "likely price the same hair-care product at different price points").

2.    *Macartney's proposed hedonic regression does not satisfy* Comcast*.*

Macartney's hedonic regression model similarly fails because it does not isolate damages attributable solely to the alleged misconduct by JPMS.  Macartney's model, like the one rejected in *Fagan v. Neutrogena Corp.*, measures a general market premium without distinguishing between the specific alleged misrepresentation and other factors that could influence consumer perception or product pricing.  *See* 2017 WL 11418358, at *3–4 (denying class certification where proposed hedonic regression measured a single premium for several distinct claims and may have encompassed premiums not attributable to the alleged misconduct).

Macartney's hedonic model is equally ill-equipped to control for different consumer impressions (*see* Hanssens Report ¶¶ 55–59) or independent variables—such as brand equity, product quality, and marketing spend (*see* ECF No. 120 at 13); nor can it exclude the value attributable to literally truthful claims, such as "pioneer in cruelty-free."  *See Bruton v. Gerber Prods. Co.*, 2018 WL 1009257, at *10 (N.D. Cal. Feb. 13, 2018) (finding proposed hedonic regression model did not satisfy *Comcast* where the proposed regression model lacked a reliable means for comparing the products with and without the challenged label statements and did not account for independent variables that might affect the products' price or sales).  While Macartney identifies variables such as changing economic conditions, product quality, and brand-specific marketing policies, *see* Macartney Report ¶ 41, he fails to explain **how** he will account for such variables.  *See* Ugone Report ¶ 42 ("[I]t appears no research was conducted to identify any specifics relating to the brand-level indicator variables . . . to reliably evaluate a

claimed price premium associated with the cruelty-free claim and not conflate the results with other product characteristics.").

Ultimately, neither method Macartney proposes establishes that damages attributable to the alleged harm—i.e., class members being misled by the Challenged Statements—"are capable of measurement on a classwide basis" under Rule 23(b)(3). *Comcast*, 569 U.S. at 34.

### D.    Trying This Case as a Class Action Is Neither Superior nor Manageable.

In determining whether a class action is superior to other methods of adjudication, a court must consider Rule 23(b)(3)'s factors, including "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).  As the Ninth Circuit has noted, "[i]f each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser*, 253 F.3d at 1192.  As demonstrated above and in JPMS's response to Plaintiffs' proposed Trial Plan (*see* O'Neill Decl. Ex. N ("Trial Plan Response"), at 1, 4–5, 10), such is the case here because "the predominating individual issues [] would require mini-trials and render any class trial 'unmanageable.'" *Stockinger v. Toyota Motor Sales, U.S.A., Inc.*, 2020 WL 1289549, at *10 (C.D. Cal. Mar. 3, 2020) (citation omitted). Plaintiffs make the gross oversimplification that "[t]he only individualized issues that might arise are if the Court requires multiple classes for the UCC breach of warranty claim." Mot. 25.  To the contrary, exposure to, understanding and materiality of, and reliance on the Challenged Statements, as well as the calculation of any damages, are all highly individualized issues, *see supra* Sections III.B & C, so a class action lawsuit is ***not*** the superior method to fairly and efficiently adjudicate the case.

Because the labels changed significantly during the class period and multiple labels were in the marketplace at once, it is also not possible to determine which label(s) a proposed class member would have seen when.[17]  Yates Decl.¶¶ 8–14; *see also* O'Neill Decl. Ex. O ("Verdict

---

[17]    While JPMS keeps records of direct purchases via its website, they represent only a small percentage of total product sales.  The majority of JPMS's sales are via third-party retailers, for which JPMS does not have individualized information.  Yates Decl. ¶¶ 10–11.

Form Response"), at 2.  Plaintiffs seemingly made no effort to acquire this information and do not account for how they will figure this out if the class is certified.  It is highly unlikely a class member who purchased a product 5–10 years ago, for example, would still have the bottle. Courts have found, in cases such as this, that class certification is improper under Rule 23(b)(3) when there is no reliable way to identify and verify purchasers.[18]

## IV.    PLAINTIFFS FAIL TO MEET RULE 23(A)'S ADEQUACY REQUIREMENTS

Plaintiffs' counsel, while perhaps theoretically qualified to lead a class action, has not demonstrated the adequacy required to vigorously prosecute *this case*, as evidenced by their repeated failure to timely and diligently litigate the matter.  *See Kaur v. Things Remembered, Inc.*, 2016 WL 11811049, at *1 (N.D. Cal. Apr. 20, 2016) (Chhabria, J.) (denying class certification where plaintiffs' counsel caused significant discovery delays and moved to amend complaint on the same day they filed their class certification motion).

Even after the Court admonished Plaintiffs' counsel for their delay in raising a discovery dispute (*see* O'Neill Decl. Ex. P (2/9/2024 Hearing Tr.), at 12:3–12), they have continued to drag their feet in prosecuting this case.  For example, Plaintiffs waited over three months to initiate the meet and confer process after JPMS objected to Plaintiffs' 30(b)(6) deposition notice and then took no class certification-related depositions at all (e.g., related to marketing).  *See* O'Neill Decl. ¶¶ 3–5.  Plaintiffs then abruptly canceled the depositions of JPMS's experts four days before the first was scheduled to occur.  *Id.* ¶ 6.  Worse still—as set forth in full in the Opp. to Motion for Leave—Plaintiffs waited until ***after*** filing this Motion to seek leave to amend the FAC, despite having known of the factual bases for the proposed amendments since the inception of this action.

## V.    CONCLUSION

For the foregoing reasons, Defendant JPMS requests that Plaintiffs' Motion be denied.

---

[18]   This issue carries over to Plaintiffs' proposed verdict form, which requires the jury to determine class-wide damages—a task that can be done only if the total number of class members is known.  *See* O'Neill Decl. Ex. O, at 2.

Dated: April 10, 2025                    DTO LAW


                                         By:    */s/ Megan O'Neill*
                                                _____
                                                Megan O'Neill
                                                Attorneys for Defendant
                                                JOHN PAUL MITCHELL SYSTEMS

APPENDIX A

Appendix A - Interpretations of Label Claims

| Label Claim [A] | Possible Interpretations [B] | Would Animal Testing in China render Label Claim (A) untrue in light of Possible Interpretation (B)? | Possible Claim-Interpretation Combinations |
|---|---|---|---|
| **"A Pioneer in Cruelty-Free Hair Care"** | JPMS was one of the first cosmetic companies to become cruelty-free. *See* Gonnella Dep. 82:13-26 ("[T]o me it means they were the first ones to become cruelty-free, a pioneer.") | Will depend interpretation of cruelty-free (see below). | 50 |
| | JPMS was the first company to publicly oppose animal testing. *See* FAC at 6 n.3 (citing PETA's website); FAC ¶ 57, 61. | No. | 8 |
| | JPMS's products are researched, formulated, and tested on humans at JPMS's Product Innovation Center. FAC ¶ 62. | No. | 1 |
| **"Cruelty-Free"\*** | Product has not been animal tested except as required by law. O'Neill Decl., Ex. L ("Irwin and Naylor") at EXPERT-MACARTNEY-001199 (defining cruelty-free for the purposes of a consumer survey). | No. | 8 |
| | Product has not been animal tested with the exception of "an animal test that was conducted to comply with a requirement of a foreign regulatory authority." Cal. Civ. Code § 1834.9.5 | No. | 8 |
| | Animal was not harmed or tortured as a result of animal testing. ECF No. 120-12, at EXPERT-MACARTNEY-00158 (conducting consumer survey regarding understanding of term "cruelty-free"); Rule Dep. 151:7-25. | Will depend on whether consumer considers skin irritation test and eye irritation tests "harm" or "torture" (see Mot. at 3). | 8 |
| | Animals were raised humanely. ECF No. 120-12, at EXPERT-MACARTNEY-00158. | No. (No allegations or evidence regarding how live animals were raised.) | 1 |
| | Animals are not used as part of *any* scientific study for a product. Heagney Dep. 40:18-25. | Yes, if conduct is attributable to JPMS. | 1 |
| | "Products and the ingredients in those products are not tested on animals anywhere in the development, testing, manufacturing, or production of a product." FAC ¶ 43. | Will depend on interpretation of animal testing. (See below). | 8 |
| | JPMS products were animal tested in the past but not *currently* tested on animals. *See* Gonnella Dep. 88:3-10 ("Q. If you bought a product that said no animal testing....and you found out that 20 years ago it had been tested on animals, would you feel like it was a misstatement..? A....[T]hat's not really a misstatement. It's a -- more of a change. "). | No. | 8 |
| | *Third parties* have not conducted animal testing on JPMS products. *See* Guerrero Dep. at 75:11-21 (claiming a product is not cruelty-free where a third party distributor has tested on it). | Depends on date of purchase. | 8 |
| **"No Animal Testing"** | Product may only be tested *by JPMS* on "skin, eyes, or other tissue samples obtained from dead animals that died from causes unrelated to testing." Hanssens ¶ 57. | Yes, if there is evidence JPMS itself tested on live animals. Otherwise, no. | 1 |
| | Product may only be tested *by any party* on "skin, eyes, or other tissue samples obtained from dead animals that died from causes unrelated to testing." *Id* . | Yes, if there is evidence anyone tested JPMS products on live animals and that conducted is attributable to JPMS. Otherwise, no. | 1 |
| | Product **may** be tested on "skin, eyes, or other tissues of living animals." *Id.* | No. | 1 |
| | Product is not tested on any animals or animal parts, dead or alive. | Yes, if there is evidence such testing occurred and the conduct is attributable to JPMS. | 1 |
| | Testing is okay, but animals cannot be killed when testing is complete so a necropsy can be performed to determine internal damage. FAC ¶ 81. | No. | 1 |
| | Product contains "less chemical or any type of filler ingredients." Guerrero Dep. 47:23-48:1. | No. No allegations or evidence regarding the types of ingredients in JPMS products were raised. | 1 |
| | Specific product consumer purchased has not been animal tested. Gonnella Dep. 82:19-21 ("[T]hey didn't -- supposed to have not have tested anything, *this product* on any animals.") (emphasis added). | No. | 1 |
| | No JPMS product was animal tested anywhere in the world. *See* Guerrero Dep. 77:7-14 ("Q. [I]f the product just tested on one animal once at any point in time anywhere in the world, the company cannot market itself as cruelty-free?...A. They can't market themself that way.") | Yes, depending on definition of animal testing. | 1 |
| **"John Paul Mitchell Systems Does Not Conduct or Endorse Animal Testing."** | JPMS is "always looking out for our furry friends." FAC ¶ 54. | Will depend on interpretation of this statement. | 1 |
| | JPMS does not *conduct* animal testing. | No. | 8 |
| | JPMS does not *endorse* animal testing. | No. | 8 |
| | JPMS lobbies against animal testing. *See* FAC ¶ 110 ("JPMS...lobbied the California legislature to adopt a more restrictive law that would not have provided certain exemptions."). | No. | 8 |
| | | **Total Possible Claim-Interpretation Combinations** | 142 |

\*Because Plaintiffs focus on the meaning of "cruelty-free" in their Motion, JPMS will also address the meaning of "cruelty-free" within "A Pioneer in Cruelty-Free Hair Care."

\*\*This chart does not address the "knowledge" component of various claims. JPMS reserves the right to argue that, even if an interpretation might be material, no liability exists where a cause of action requires knowledge but JPMS lacked knowledge.

\*\*\*This chart does not address whether conduct of third-parties can be attributed to JPMS.